UNITED STATES of America,
Plaintiff–Appellant,

v.

Victoria L. RAY, Defendant–Appellee.

No. 03–30339.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 9, 2004.

Filed July 23, 2004.

982

Steven L. Lane, United States Department of Justice, Washington, DC, for the plaintiff-appellant.

Anthony R. Gallagher, Federal Defender of Montana, Great Falls, MT, for the defendant-appellee.

Robert S. Bennett, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC, for the amicus curiae.

Before GRABER and CLIFTON, Circuit Judges, and BREWSTER,* District Judge.

GRABER, Circuit Judge.

In this case, the functions of our three branches of government intersect at a novel point. The United States District Court for the District of Montana issued Standing Order No. DWM–28 ("Standing Order"). The Standing Order directed the United States Attorney, within 20 days after sentencing occurs in each criminal case, to assemble and file with the court clerk a report of sentence. The court clerk was to send these reports to the United States Sentencing Commission, in order to satisfy a reporting requirement that Congress has imposed on the courts. We are asked to decide whether the district court exceeded its statutory or inherent authority, or the limits of the Constitution, by issuing the Standing Order.

Before reaching the merits of that question, however, we must consider our jurisdiction to answer it. The United States argues that we have jurisdiction to consider its direct appeal from the district court's order denying its motion to set aside the Standing Order in this criminal case, which was one of the first cases in which the Standing Order's requirements were triggered, even though neither party has appealed with respect to the underlying judgment of conviction. In the alter-

---

* The Honorable Rudi M. Brewster, Senior Judge, United States District Court for the Southern District of California, sitting by designation.

native, if appellate jurisdiction is lacking, the United States petitions for a writ of mandamus.

These questions have divided our panel. Judge Clifton joins in Sections I, II, and III of Judge Graber's opinion. Judge Brewster joins in Sections I, III, and IV of Judge Graber's opinion. Thus, we are unanimous as to Sections I and III, while two judges agree on Sections II and IV. As a result, a majority of our panel concludes that the district court acted within the scope of its statutory and inherent authority when issuing the Standing Order and that the Standing Order did not violate the constitutional doctrine of separation of powers. The Standing Order thus remains in effect.

## I. BACKGROUND

A. *Reporting Requirements Under Federal Sentencing Law*

In the Sentencing Reform Act of 1984, Congress created the federal Sentencing Commission as an independent body within the judicial branch. *See* Pub.L. No. 98–473, 98 Stat. 1837, tit. II, ch. II, § 217 (effective 1987). The Act also created a reporting requirement, which provided that"[t]he appropriate judge or officer shall submit to the Commission in connection with each sentence imposed ... a written report of the sentence." *Id.* (first codified at 28 U.S.C. § 994(v), later redesignated as 28 U.S.C. § 994(w)).

A 1997 Memorandum of Understanding between the Administrative Office of the United States Courts and the Sentencing

Commission, apparently intended to improve compliance with § 994(w)'s reporting requirement, provides insight into how the requirement generally was satisfied:

> Most districts ask the probation office to submit the sentencing documents, and this is, as noted, generally being done faithfully. However, particularly where the probation office is not involved in the proceeding, the Chief Judge may want to meet with the United States Attorney's office and others to decide on the most efficient way to submit [post-conviction] changes to the judgment.... These may be sent directly by other entities, or channeled through probation, as the court wishes.

The Memorandum of Understanding set forth the complete list of documents to be submitted as part of the sentencing report and "request[ed] that each Chief Judge designate a procedure by which the ... documents are sent to the Commission."

On April 30, 2003, Congress amended § 994(w)'s reporting requirement. Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (sometimes called the "PROTECT Act"), Pub.L. No. 108–12, 117 Stat. 651, tit. IV, § 401(h) ("Improved Data Collection").[1] The text of the basic reporting requirement was amended to read, in part:

> The Chief Judge of each district court shall ensure that, within 30 days following entry of judgment in every criminal case, the sentencing court submits to the Commission a written report of the sentence....

---

1. In the 2003 Act, Congress also created or modified several other reporting requirements. It (1) required the Attorney General to submit to Congress a report in every case in which a district judge grants a downward departure (section 401(*l*)(2), 18 U.S.C. § 3553 note); (2) expanded the existing "statement of reasons" requirement by mandating that courts provide the statements to the Commission as well as to the probation offices and the Bureau of Prisons (section 401(c)(3), 18 U.S.C. § 3553(c)); and (3) required the Commission to make the reports that it receives from the courts available to Congress and the Attorney General (section 401(h), 28 U.S.C. § 994(w)(2), (4)).

28 U.S.C. § 994(w)(1). The Act also codified the specific list of documents to be submitted in each report. *Id.* § 994(w)(1)(A)-(F).[2]

### B. *The District Court's Standing Order and This Litigation*

On May 9, 2003, "[i]n view of the new reporting requirements in the PROTECT Act of 2003," the Chief Judge for the District of Montana issued the Standing Order at issue here. It contains four directives:

1. After sentencing in each case, the United States Attorney shall assemble a "Report of Sentence" that includes the following documents:

 (a) a cover page setting forth the sentence, the offense or offenses for which it was imposed, the age, race, and sex of the offender, and all adjustments and departures actually applied in fashioning the sentence;

 (b) a copy of the judgment and commitment order;

 (c) a copy of the Court's statement of reasons for the sentence imposed;

 (d) a copy of any plea agreement;

 (e) a copy of each ... charging document filed in the case ...; and

 (f) a copy of the presentence report.

2. Within twenty days after sentencing in each case, the United States Attorney shall present to the Clerk of Court, Missoula Division, two copies of the cover page along with the remainder of the Report of Sentence.

3. The Clerk of Court shall mail the Report of Sentence to the Sentencing Commission.

4. In the event a Report of Sentence is not presented within twenty days after sentencing, the Clerk of Court shall report the deficiency to the attention of the Chief Judge.

Also on May 9, 2003, a judgment of conviction was entered in the criminal case of *United States v. Victoria L. Ray,* No. CR–02–0005–DWM, in the District of Montana. Rather than assemble and file a report of the sentence imposed in that case, pursuant to the Standing Order, the United States Attorney filed a Motion to Set Aside the Standing Order (or, in the alternative, to stay enforcement of the Standing Order pending appellate review).[3]

After a hearing before the District of Montana's three active judges, the district

---

**2.** The full text of § 994(w)(1) reads as follows: The Chief Judge of each district court shall ensure that, within 30 days following entry of judgment in every criminal case, the sentencing court submits to the Commission a written report of the sentence, the offense for which it is imposed, the age, race, sex of the offender, and information regarding factors made relevant by the guidelines. The report shall also include—
(A) the judgment and commitment order;
(B) the statement of reasons for the sentence imposed (which shall include the reason for any departure from the otherwise applicable guideline range);
(C) any plea agreement;
(D) the indictment or other charging document;

(E) the presentence report; and
(F) any other information as the Commission finds appropriate.

**3.** The district court denied the motion to stay enforcement of the Standing Order, both in *Ray* and in several other cases. In those other cases, we reversed and ordered that enforcement of the Standing Order be stayed pending the district court's decision on the merits of the motion, in *Ray*, to set aside the Standing Order. Orders of 6/13/03, 6/20/03, and 7/7/03 in No. 03–30246. After our decisions, the district court suspended enforcement of the Standing Order in all cases, pending its decision on the merits of the motion in *Ray*.

court denied the motion to set aside the Standing Order.[4] In its order dated July 29, 2003 ("July 29 order"), the court explained that, because the District of Montana consists of five dispersed divisions and has no "central hub," the Standing Order was the most efficient way to comply with the statutory reporting requirement. The court held that the Standing Order did not conflict with the PROTECT Act, did not exceed the court's authority, and did not violate the Constitution. On August 1, 2003, the United States appealed from the July 29 order and, alternatively, petitioned for a writ of mandamus.[5]

## II. JURISDICTION

■ Although the United States and the district court agree that we have jurisdiction under 28 U.S.C. § 1291 to consider this appeal, Ray contends that we lack jurisdiction because the underlying criminal matter has been fully adjudicated and thus no case or controversy remains as between the government and Ray.[6] This court has an independent obligation to determine its jurisdiction. *United States v. Ceja–Prado,* 333 F.3d 1046, 1049–50 (9th Cir.2003).

We have "jurisdiction of appeals from all final decisions of the district courts of the United States" in both civil and criminal matters. 28 U.S.C. § 1291. Thus, under § 1291 we must decide whether the dis-

trict court's July 29 order was a "final decision." We also address Ray's argument that the resolution of the underlying criminal matter makes this appeal moot.

A. *The July 29 order was a "final decision."*

■ . *The Supreme Court has emphasized that the finality* requirement is to be given "a 'practical rather than a technical construction.'" *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 375, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981) (quoting *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). Under modern doctrine, a " 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.... The foundation of this policy is not in merely technical conceptions of 'finality.' It is one against piecemeal litigation." *United States v. One 1986 Ford Pickup,* 56 F.3d 1181, 1184 (9th Cir.1995) (per curiam) (quoting *Catlin v. United States,* 324 U.S. 229, 233–34, 65 S.Ct. 631, 89 L.Ed. 911 (1945)).

■ An order can be a "final decision" for purposes of § 1291 even if it is not the order terminating the primary litigation. Under the collateral order doctrine announced in *Cohen,* 337 U.S. at 546, 69 S.Ct. 1221, an order is "final" if it (1)

---

4. Federal Rule of Criminal Procedure 32 governs the procedures for sentencing a defendant in a criminal case. Rule 32(k)(1) provides the general rule for what a judgment of conviction must contain and how it must be signed and entered. Rule 47 requires that a party who is applying to the court for an order must do so by motion. Accordingly, as a party the United States Attorney could apply to the district court for an order setting aside the Standing Order as it applied to the sentencing procedures employed in the *Ray* prosecution. The district court thus had jurisdiction to entertain the motion.

5. On August 8, 2003, we granted the United States' motion for an emergency stay of the Standing Order pending our decision on the appeal.

6. Ray also asks that we remove her name from the caption, which we decline to do because we are reviewing a collateral order connected to her case. She takes no position on the propriety of the Standing Order.

fully disposes of an issue before the court, (2) resolves an issue collateral to the underlying subject of the litigation, and (3) involves an important right otherwise irreparably lost if review had to await final judgment. *See United States v. Poland (In re Derickson)*, 640 F.2d 946, 948 (9th Cir.1981) (per curiam); *see also United States v. Friedman*, 366 F.3d 975, 979 (9th Cir.2004) (listing *Cohen* factors). Furthermore, "when post-judgment orders are involved[,][t]he policy against and the probability of piecemeal review is not as decisive a consideration after judgment as before judgment since the underlying dispute is already settled." *United States v. Washington*, 761 F.2d 1404, 1406 (9th Cir.1985). Indeed, "unless such orders are found final, there is often little prospect that further proceedings will occur to make them final." *Id.; see also Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1224 (7th Cir.1993) ("The final-decision rule (28 U.S.C. § 1291) postpones appeal to the final judgment—but what about orders issued *after* the final judgment? There is no problem when the postjudgment order concludes a discrete, collateral proceeding, such as a proceeding to award attorney's fees for services rendered before the entry of the final judgment.").

For these reasons, this court has found post-judgment orders to be "final" for purposes of § 1291 in a variety of criminal and civil contexts. Post-judgment orders involving attorney fees under the Criminal Justice Act of 1964 ("CJA"), 18 U.S.C. § 3006A, have been held to be "final" within the meaning of *Cohen. United States v. Walton (In re Baker)*, 693 F.2d 925, 926 (9th Cir.1982) (per curiam); *Derickson*, 640 F.2d at 948.[7] In *Derickson,* we noted:

> The third *Cohen* factor[,] the involvement of an important right otherwise lost if review had to await final judgment[,] is, of course, inapplicable since Derickson submitted his fee request, following the usual procedure, after entry of final judgment in the underlying case.

640 F.2d at 948. Section 1291 also has supported jurisdiction for an appeal from a district court order directing the government to expunge all records of a 20–year–old criminal conviction from its files: "[T]o the extent that the district court's order

---

**7.** A comparison of *Baker* and *Derickson* also demonstrates that the July 29 order was a *judicial* decision—rather than an administrative or ministerial order from which appeal is not available. *See In re L.B. & W. 4217*, 238 F.2d 163, 166 (9th Cir.1956) (holding that"our jurisdiction extends only to final decisions of a judicial character"). *Compare Baker*, 693 F.2d at 925–26 & n. 1 (holding that an order setting the *amount* of attorneys' fees under the CJA was a nonappealable administrative decision, and distinguishing *Derickson*), *with Derickson*, 640 F.2d at 948 (holding that appeal was proper from the district court's decision that it lacked jurisdiction under the CJA to award fees *at all* ). *See also Russell v. Hug*, 275 F.3d 812, 821 (9th Cir.2002) ("Our jurisdiction to review final judgments of the district courts, conferred by 28 U.S.C. § 1291, does not authorize us to engage in supervisory oversight of administrative actions of the district courts. [Citing

*Baker*, 693 F.2d at 926–27.] Although in reviewing a judgment of the district court we may adjudicate, as we have today, the legality of a provision of the plan when it is challenged by one to whom it is applied, we may not exercise more general supervisory power over the terms and administration of the plan.").

Furthermore, by appealing the district court's July 29 order, the United States was not appealing a purely ministerial post-judgment order (such as an order disbursing the funds awarded in the earlier judgment) in hopes of reviving its substantive disagreement with a final judgment from which it had not appealed. That was the scenario in *American Iron-works & Erectors Inc. v. North American Construction Corp.*, 248 F.3d 892, 898 (9th Cir. 2001), where we held that we lacked jurisdiction to consider an appeal of a post-judgment disbursement order.

constituted an injunction against the United States and its agencies, the order was a 'final decision'...." *United States v. G,* 774 F.2d 1392, 1393 (9th Cir.1985). Finally, although civil contempt orders entered during litigation cannot be appealed until final judgment is entered, *post-judgment* orders of civil contempt are appealable immediately under § 1291. *See Hilao v. Estate of Marcos,* 103 F.3d 762, 764 (9th Cir.1996) (holding that post-judgment orders of contempt are final and appealable under § 1291); *Shuffler v. Heritage Bank,* 720 F.2d 1141, 1145 (9th Cir.1983) (holding that the civil contempt order had "acquired all the elements of operativeness and consequence necessary to be possessed by any judicial order to enable it to have the status of a final decision under § 1291") (internal quotation marks omitted); *see also Sportmart, Inc. v. Wolverine World Wide, Inc.,* 601 F.2d 313, 316 (7th Cir.1979) ("[M]ost post-judgment orders are final decisions within the ambit of 28 U.S.C. § 1291 as long as the district court has completely disposed of the [underlying] matter.").

Here, we conclude that the district court's July 29 order refusing to set aside the Standing Order was a final decision, which is appealable under § 1291. As a post-judgment order, it does not implicate concerns about piecemeal review. The order was a final determination of the United States Attorney's obligation to comply with the Standing Order in the present case—an issue that is collateral to Ray's prosecution, conviction, and eventual sentence. As we will discuss in Part IV, the Standing Order was incidental to the sentencing process. The United States Attorney's appeal is therefore similar to appeals involving the question whether fees are to be paid to appointed counsel: Both appeals seek to vindicate rights of a party's *representative,* rather than of the party itself, yet both issues are sufficiently connected to the underlying criminal case to be cognizable on appeal.[8]

B. *This appeal is not moot.*

■ Of course, we still would lack jurisdiction to consider this appeal if it did not satisfy the "case or controversy" requirement of Article III. *See Foster v. Carson,* 347 F.3d 742, 745 (9th Cir.2003) ("Mootness is a jurisdictional issue, and federal courts have no jurisdiction to hear a case that is moot, that is, where no actual or live controversy exists." (internal quotation marks omitted)). Ray argues that the absence of a continuing controversy between herself and the government renders this appeal moot. We disagree.

We regard the United States Attorney's appeal as similar to appeals involving litigation sanctions or sealing orders, in which an ongoing conflict between a district court and one remaining party is sufficient to establish a "case or controversy." *See, e.g., Riverhead Sav. Bank v. Nat'l Mortgage Equity Corp.,* 893 F.2d 1109, 1112 (9th Cir.1990) (holding that, although sanctions to be paid *to another party* were mooted by the parties' settlement, sanc-

---

8. Our decision on the merits is not affected by our resolution of the jurisdictional issue. Were we to consider this challenge as a petition for a writ of mandamus, we would require the United States to meet the more stringent standard for issuance of the writ. *See United States v. Harper,* 729 F.2d 1216, 1221–22 (9th Cir.1984) (stating that a writ of mandamus should issue only if the "district court's order is clearly erroneous as a matter of law," such that the court is "left with the definite and firm conviction that a mistake has been committed") (internal quotation marks omitted). Because we reject the United States' argument that the district court lacked authority to enter the Standing Order even under the more deferential standard that we apply to an appeal, our decision necessarily would remain the same under the stricter mandamus standard.

tions to be paid *to the court* "are reviewable on appeal regardless of whether the parties settle"); *United States v. Vazquez,* 145 F.3d 74, 83 (2d Cir.1998) (holding that a live controversy existed where the prevailing party remained subject to a sealing order).[9] The continuing controversy between the United States Attorney and the district court, in which the United States Attorney alleges an injury capable of redress by this court, satisfies the "case or controversy" requirement of Article III.

## III. STANDARDS OF REVIEW

■■ We review de novo the district court's resolution of legal issues, such as questions of statutory interpretation, *United States v. Salemo,* 81 F.3d 1453, 1457 (9th Cir.1996), and questions involving the court's authority to act, *United States v. Gatto,* 763 F.2d 1040, 1044–45 (9th Cir. 1985). We review for abuse of discretion the district court's exercise of its authority. *United States v. Doe,* 125 F.3d 1249, 1253 (9th Cir.1997).

## IV. MERITS

■ The United States contends that the Standing Order contravenes Congress' intent, exceeds the district court's authority, and violates the doctrines of separation of powers and sovereign immunity. In rejecting those arguments, we rely on three propositions: (1) that 28 U.S.C. § 994(w)(1) imposes a limited duty on the courts; (2) that this limited duty has become a part of the sentencing process in each criminal case; and (3) that the district court's power to comply with that statutory duty by reasonable means, as well as to regulate the practice of litigants before it, authorized the court to issue the Standing Order.

By enacting § 994(w)(1), Congress imposed a duty on the district court to *submit* (not to draft, not to prepare, not to compile, not to write, not to originate, not to assemble) a sentencing report in connection with each federal criminal case. To fulfill its duty, the district court may employ all the powers it possesses, including both the powers impliedly granted by § 994(w)(1) *and* the court's accustomed, inherent powers of case management. Those inherent powers include requiring a lawyer to prepare a document for the court's use in connection with a specific case in which the lawyer represents one of the litigating parties. That is all the challenged Standing Order does.

Furthermore, by requiring the assistance of the United States Attorney in connection with a judicial proceeding to which the United States Attorney is a party, the Standing Order does not run afoul of the constitutional doctrine of separation of powers. The Constitution affords courts ample space to demand the assistance of an officer of the court in the context of litigation—even when that officer is also an officer of the executive branch. Indeed, we would create a separation-of-powers concern by interpreting § 994(w)(1) to have imposed a duty that is *unrelated* to the central mission of the judicial branch. By reading the statute as imposing a duty closely related to the sentencing process in each case—and therefore as constitutional—we follow the doc-

---

**9.** *See also Vazquez,* 145 F.3d at 83 ("When one party has prevailed, and the losing party has not taken an appeal, there is usually no live controversy because the winning party has not suffered the sort of injury necessary to confer standing on appeal. Vazquez, however, is currently subject to a court order with respect to the sealed videotapes. She claims the court did not have authority to enter that order. There can be no doubt that she has identified a present injury that stems from an adverse ruling of the district court." (citation omitted)).

trine of constitutional avoidance and, at the same time, confirm the district court's authority to issue the Standing Order.

### A. The Standing Order does not conflict with § 994(w)(1).

■ The statute states that the "Chief Judge of each district court shall *ensure* that, within 30 days following entry of judgment in every criminal case, the sentencing court *submits* to the Commission a written report of the sentence." 28 U.S.C. § 994(w)(1) (emphasis added). By its plain text, the statute imposes only two duties: first, that the district court "sub-mit" a report in each criminal case; and, second, that the chief judge of each district "ensure" that the court submits the reports in a timely fashion. Neither the statute nor—if we must resort to it—its legislative history [10] suggests that Congress intended to require the district court to draft, prepare, compile, write, originate, or assemble the reports at all, or in any particular manner.[11] Of course, a sentencing report that has not been prepared or compiled cannot be submitted; to that extent, Congress implicitly required that those prefatory tasks be done.[12] But the statute contains no evidence that Congress

---

**10.** There appears to have been no substantive debate in Congress surrounding the recent amendment of this provision. Section 401 of the PROTECT Act was drawn from the House version of the bill (the Senate version had no provision relating directly to sentencing reform), and the House Report does not discuss the change to § 994(w). House Conf. Rep. No. 108–66 (2003), *reprinted in* 2003 U.S.C.C.A.N. 683, 693–94.

**11.** The word "submit" means "to send or commit for consideration, study, or decision ... to present or make available for use or study," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2277 (1993), or "to present or propose to another for review, consideration or decision," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, TENTH EDITION 1169 (1993). These dictionary definitions do not suggest that, by using the word "submit," Congress intended to encompass tasks prefatory to the sending of the sentencing reports. *See* op. of J. Clifton at 9818 (arguing that the duty to "submit" includes "all associated tasks involved with 'presenting' the sentence reports"). Indeed, the common emphasis of the dictionary definitions of "submit" is not on what happens *before* the item reaches its recipient, but on the fact that the recipient will assess or pass judgment on the item (or on a question to which the item relates). This is seen most clearly in the use of the general and passive verb "to bring under" in a definition of "submit" as "[t]o bring under a person's view, notice, or consideration." OXFORD ENGLISH DICTIONARY (2d ed.1989), *http:// dictionary.oed.com*.

Courts have interpreted the word "submit" primarily in resolving disputes over the application of the mailbox rule to filing deadlines. *See, e.g., Lord Jim's v. NLRB*, 772 F.2d 1446, 1449 (9th Cir.1985) (dismissing argument that the NLRB's definition of "submit" to mean "received by" violated due process); *Jones v. West*, 13 Vet.App. 129, 130 (1999) (per curiam) ("The Court [of Appeals for Veterans' Claims] has defined the term 'submit' to mean 'received by the Court within [thirty] days of final judgment.' ") (second alteration in original); *Withers v. U.S. Postal Serv.*, 417 F.Supp. 1, 6 (W.D.Mo.1976) (deferring to, and agreeing with, the agency's interpretation of "submits" to require receipt, rather than mere postmarking, of an appeal); *cf. Am. Pac. Roofing Co. v. United States*, 21 Cl.Ct. 265 (1990) (holding that a contractor properly submitted its claim to the contracting officer, as required by statute, by mailing the claim to another entity for forwarding to the contracting officer). Our colleague's citation to *Withers*, op. of J. Clifton at 9818, establishes only that a court believed that the risk of delays in the mail made it prudent to deem employment appeals "submitted" as of the date they were received. *See Withers*, 417 F.Supp. at 6 n. 4.

**12.** Furthermore, as we will conclude in Part IV.B.1, *infra*, Congress implicitly authorized the courts to accomplish these prefatory tasks by reasonable means. This conclusion—that the duty to submit the reports includes the power to employ reasonable means to assemble and compile the reports—is not, as our colleague asserts, a concession that the courts

meant to dictate the manner in which they are accomplished. Congress was silent on those prefatory matters; its stated focus was on obtaining substantive information from the courts and on obtaining it promptly.

Neither does the statutory context suggest a congressional intent that district courts themselves prepare and compile the sentencing reports. The government notes that the PROTECT Act assigned separate reporting requirements to other entities (*see supra* note 1) and argues that, had Congress wanted United States Attorneys to prepare and compile the sentencing reports, it would have expressed that intent directly when detailing the United States Attorney's new duties. Like so many canons of statutory construction, however, this principle (*"expressio unius est exclusio alterius"*) can be employed as easily to support the opposite interpretation. That is, had Congress *cared* how the sentencing court prepared or compiled the reports, Congress would have assigned those duties expressly to the court in the statute. It did not, nor did it implicitly signal a desire that courts themselves fulfill those tasks.[13]

Finally, the government can find little support in the principle that Congress ratifies an administrative interpretation of a statutory provision when it amends the statute without altering that provision.

*See Lindahl v. Office of Personnel Mgmt.*, 470 U.S. 768, 783 n. 15, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985) (" 'Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change ....' ") (quoting *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)). The government argues that, by amending § 994(w) without addressing the method by which the sentencing reports were to be prepared or compiled, Congress expressed its intent that the reports be prepared and compiled as they had been in the past—by probation departments. (According to the 1997 Memorandum of Understanding, discussed above, the reports generally, although not exclusively, had been prepared by probation departments.) Our colleague refines this argument by suggesting, more generally, that Congress intended to "embody" the practice of having the reports assembled and compiled by one of the entities assigned to submit the reports. Op. of J. Clifton at 1002–1003. These arguments suffer from several difficulties.

Even assuming that the Sentencing Commission's Memorandum of Understanding and Annual Reports, *see* op. of J. Clifton at 9823–24, alerted Congress to the existing administrative "interpretation" of

themselves have a duty to assemble and compile the reports. *See* op. of J. Clifton at 998–99.

**13.** Our colleague argues that, because Congress logically could not have cared which entity mailed the completed reports, Congress' reason for assigning different reports to different entities must have been its desire that the assigned entity prepare and compile the reports. Op. of J. Clifton at 999–1000. We disagree. Congress' stated interest in the § 994(w)(1) reporting requirement was to improve data collection; it may well have

believed that assigning a specific entity to submit those reports would improve data collection by making that entity clearly accountable for their ultimate submission. Furthermore, because the sentencing reports are simply a compilation of existing documents, their content and utility are no more affected by the entity that compiles them than they are by the entity that mails them. Without a clearer signal that a report depends on the special perspective of the entity charged with submitting it, we will not assume that Congress intended to micromanage that entity's manner of producing it.

§ 994,[14] the principle of ratification re-quires that there *be* a settled interpretation of which Congress could have been aware. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 531, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). The Memorandum of Understanding and the Annual Reports demonstrate that the Sentencing Commission and the courts interpreted the statute to permit collaboration and flexibility in selection of the "appropriate judge or judicial officer" and in such officer's compliance with the requirement. Every year from 1995 to 2001, the Annual Reports stated: "Pursuant to its authority under 28 U.S.C. §§ 994(w) and 995(a)(8), and *after discussions* with the Judicial Conference Committee on Criminal Law and the Administrative Office of the U.S. Courts (AO), the Commission *requested* that the probation office submit the following documents...." [15] (Emphasis added.) Yet the 1997 Memorandum of Understanding stated that *"[m]ost districts"* used the help of the probation office and that "the Chief Judge may want to meet with the United States Attorney's office and others *to decide on the most efficient way* to submit" the information, which "may be sent directly by other entities, or channeled through probation, *as the court wishes."* [16] 1997 Memorandum of Understanding (emphasis added). As the emphasized text shows, the 1997 Memorandum of Understanding gave the Chief Judge the authority "to decide on the most efficient way" and noted that the choice among options was to be "as the court wishes." The Standing Order is consistent, then, with the administrative interpretation of the statutory text even if Congress intended to incorporate that interpretation.

Moreover, even Congress' approval of a particular, settled manner of implementing the reporting requirement would not have prevented the implementing entities from altering their practice. *See Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Brock*, 835 F.2d 912, 916 (D.C.Cir.1987) ("[T]he Supreme Court has stated that such legislative approval of an agency's policy does not necessarily preclude the agency from subsequently changing that policy.... To freeze an agency interpretation, Congress must give a strong affirmative indication that it wishes the present interpretation to remain in place.").

Here, not only did Congress give no affirmative indication that it wished to freeze the existing policy, it actually amended the statute to place greater emphasis on the responsibility of chief judges to ensure that the courts submit the sentencing reports.

In short, nothing in the PROTECT Act *prevented* the district court from issuing the Standing Order. The next question to be addressed is whether § 994(w)(1), or some other source of the court's power, affirmatively gave it the authority to issue the Standing Order.

**B.** *The district court had authority to issue the Standing Order.*

The district court's authority to issue the Standing Order derives from two sources. First, viewing the statute in the light of general principles of statutory in-

---

**14.** This assumption is by no means required. *See Rabin v. Wilson–Coker*, 362 F.3d 190, 197 (2d Cir.2004) ("We find no support in the cited cases for the proposition that we should assume Congress's awareness of an administrative interpretation that does not result from notice and comment rulemaking.")

**15.** The Annual Reports shed no light on the administrative interpretation of the word "submit"; they merely *repeat* the word.

**16.** This method was urged "particularly," but not solely, when the probation office was not involved in the proceeding.

terpretation, we conclude that Congress' imposition of the reporting requirement implies a corresponding grant of sufficient power to authorize the Standing Order. Second, viewing the statutory requirement as part of the sentencing process in each criminal case, we conclude that the district court's inherent power to regulate the practice of litigants before it includes the authority to require a party to prepare and file documents like the sentencing reports.

1. *By imposing a duty, § 994(w)(1) impliedly granted district courts the power to take steps reasonably necessary to comply with the duty.*

When Congress requires a governmental body to take a specified action, the statute implicitly includes the authority for the governmental body to accomplish that statutory directive in a reasonable manner. "Where a statute confers powers or duties in general terms, all powers and duties incidental and necessary to make such legislation effective are included by implication." 2B Norman J. Singer, Statutes and Statutory Construction 388, § 55.04 (6th ed.2000). For example, we have held that the statutory duty of the United States Attorney to "prosecute for all offenses against the United States," 28 U.S.C. § 547(1), implies the authority to make plea agreements incidental to prosecution. *Thomas v. INS,* 35 F.3d 1332, 1339 (9th Cir.1994). To similar effect, see *United States v. Jones,* 204 F.2d 745, 754 (7th Cir.1953) ("A general grant of power, unaccompanied by definite directions as to how the power is to be exercised, implies the right to employ means and methods necessary to comply with statutory requirements."). The same principle has been applied in construing the scope of statutory authority given to executive-branch entities. *See, e.g., In re Permian Basin Area Rate Cases,* 390 U.S. 747, 776–77, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)

(noting that the width of administrative authority must be considered in the light of the purposes for which it is conferred and that Congress is presumed to give authority adequate to achieve those purposes with reasonable effectiveness).

We hold that, under the circumstances presented in this case, demanding the assistance of the litigating parties can be considered a reasonably necessary means for the chief judge to "ensure" that the sentencing courts promptly "submit" full and accurate sentencing reports. The special circumstances found in the District of Montana—with its three active judges sitting in five separate divisions—pose special challenges for complying with the reporting requirement. By altering the reporting requirement in 2003 to require each chief judge to "ensure" that the reports were submitted completely and on time, Congress suggested that chief judges are to have some flexibility in developing a system for submitting the reports—indeed, the Act's text echoes the similar suggestion in the 1997 Memorandum of Understanding. As noted, that Memorandum expressly contemplated that a chief judge's system for submitting the documents could include the participation, and even the direct submission of documents, by entities such as the United States Attorney's Office.

In sum, § 994(w)(1) impliedly authorized the Standing Order.

2. *The Standing Order also was permissible as a regulation of judicial proceedings.*

The district court's power to issue the Standing Order came not only from the authority implied by the statute, but also from the court's inherent authority to regulate the practice of litigants before it.

■ "Courts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties." *In re Peterson*, 253 U.S. 300, 312, 40 S.Ct. 543, 64 L.Ed. 919 (1920). The power acknowledged by the Court in *Peterson* has been described as the authority to take actions "necessary only in the practical sense of being useful." *Eash v. Riggins Trucking Inc.*, 757 F.2d 557, 563 (3d Cir.1985) (en banc). This inherent authority has been acknowledged explicitly by Congress in Federal Rule of Criminal Procedure 57(b), among other provisions. Rule 57(b) gives district courts power to "regulate practice in any manner consistent with federal law, these rules, and the local rules of the district." The advisory committee's notes to Rule 57(b) contemplate that courts may exercise this authority by issuing standing orders of general application. Fed. R.Crim.P. 57(b), advisory committee's notes (1995 amends.).[17]

The government argues that citation to the court's case management authority is inapposite because the reporting requirement of § 994(w)(1) is not part of a judicial proceeding for the enforcement of rights. In the government's view, the court's power to regulate practice can encompass only those requirements that will assist the court in its core adjudicatory functions. Because the submission of sentencing reports is part of the court's "monitoring" or "policymaking" function, the government contends, the delegation of the duty to compile those reports is not within the court's power to regulate practice. We are not persuaded.

The reporting requirement is reasonably incidental to the core judicial function of sentencing individual defendants and, therefore, is part of a judicial proceeding in which courts enjoy their usual power to regulate practice. Ordering the United States Attorney to compile the contents of sentencing reports falls within the court's broad authority to regulate practice.

In regulating practice, courts commonly and permissibly compel assistance from litigants that is essentially clerical in nature and is only loosely related to the court's core adjudicatory functions. And district courts regularly demand this assistance in order to complete tasks that the courts themselves are required to accomplish. For example, district courts are required to make findings of fact in civil cases. Fed.R.Civ.P. 52(a). Yet, we have recognized that district courts have the power to, and commonly do, order a party to prepare the written statement of those findings. *See, e.g., Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173*, 886 F.2d 1200, 1204 n. 5 (9th Cir. 1989) (en banc) (recognizing the "all too commonplace practice" of district judges to adopt findings prepared by the prevailing party); *Indus. Bldg. Materials, Inc. v. Interchem. Corp.*, 437 F.2d 1336, 1339 (9th Cir.1970) (same). Indeed, some courts decide a case and *then* order the prevailing party to prepare and submit findings of fact. *See* 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure 530, § 2578 (1995). Such written findings do not help the judge decide the facts, but are an after-the-fact administrative or ministerial chore

---

**17.** The 1995 Amendments discourage (but do not prohibit) the regulation of practice by internal directives, such as standing orders, because internal directives do not provide widespread notice to litigants in the way that promulgation of a local rule would. That criticism is inapposite here because the Standing Order affected only the United States Attorney, who had ample notice of the Order.

imposed on the party.[18] Here, the United States Attorney represents the federal government, which is a party to each federal criminal proceeding.

Other administrative obligations that our own court imposes on the United States Attorney are even further removed from our core function of deciding a case. *See, e.g.,* Ninth Circuit General Order 2.3(b) (requiring the United States Attorney to serve default orders on defendants); *id.* 12.8 (requiring the United States Attorney to deliver returned mail to prisoners). Furthermore, these obligations apply both before and after issuance of a disposition.

It is true that the Supreme Court has characterized the Sentencing Reform Act of 1984 as a delegation to the judicial branch of *nonadjudicatory* functions. *Mistretta v. United States,* 488 U.S. 361, 388–89, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).[19] However, the Court went on to explain that the judiciary *can* be compelled to perform nonadjudicatory duties and functions, but *only if they are closely related to the central mission of the judicial branch. Id.* at 389, 109 S.Ct. 647. The Court gave several examples of duties and functions permissibly delegated to Article III courts that are "not necessarily or directly connected to adversarial proceedings in a trial or appellate court." *Id.* at 389 n. 16, 109 S.Ct. 647. These functions included supervising grand juries, participating in the issuance of search warrants, and reviewing wiretap warrant applications. *Id.*

These examples show that a court retains its authority to manage the proceedings before it even when it is not engaged directly in adversarial or adjudicatory proceedings. For instance, we have acknowledged that, as part of their supervision of grand jury proceedings, district courts continue to possess the "inherent ability ... to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice," so long as those rules do not contravene or circumvent other federal statutes or rules. *United States v. Larrazolo,* 869 F.2d 1354, 1358 (9th Cir.1989), *overruled on other grounds by Midland Asphalt Corp. v. United States,* 489 U.S. 794, 799–800, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989); *see also United States v. Armstrong,* 781 F.2d 700, 703 (9th Cir.1986) ("When a grand jury witness refuses to testify, civil contempt sanctions can be imposed to coerce compliance with the court's order, and penalties for criminal contempt can be assessed to punish the witness' disobedient conduct.").

In a sense, Congress grafted the requirements of § 994(w)(1) onto the sentencing phase of each criminal proceeding in district court. When judges are assigned tasks falling outside the precise limits of their adjudicatory functions, they are not—and should not be—stripped of their power to manage the proceedings, at

---

18. Although the requirements of the Standing Order were triggered in each criminal case, the district court did not enter a separate order in each case. Therefore, we cannot say, technically, whether the order was filed before or after the entry of judgment in each case. In any event, although we recognize that the obligation imposed by the Standing Order must be *fulfilled* after the entry of judgment, we do not think that this fact distinguishes it substantively from a post-trial, prejudgment order to prepare written findings.

19. In *Mistretta,* the Supreme Court focused on the constitutionality of the Sentencing Commission's Guidelines and did not discuss directly the reporting requirements imposed upon sentencing courts. 488 U.S. at 362, 109 S.Ct. 647; *but see id.* at 369–70, 109 S.Ct. 647 (describing the courts' submission and the Commission's review of sentencing reports as a "monitoring function").

least when the assigned task is one closely connected to each judicial proceeding. The district court's Standing Order was a permissible method of managing this aspect of the criminal proceedings before it.

Contrary to the government's arguments, it does not follow from our conclusion that there is no limit to what a district court can require of a litigant in connection with a particular case. Section 994(w)(1) itself provides the limit to the authority we recognize here. That is, a district court can compel the assistance of litigants to complete tasks the court is required to complete in connection with a judicial proceeding. Because Congress chose to attach the reporting requirement to the conclusion of each criminal proceeding, the reporting requirement falls within the district court's authority to manage those proceedings and does not implicate the separation-of-powers doctrine. Indeed, interpreting the reporting requirement in this way allows us to avoid another constitutional concern.

### C. The Standing Order does not violate the Constitution.

 The government contends that the Standing Order violates the separation-of-powers doctrine because, by "commandeering" the assistance of United States Attorneys, it "interfere[s] impermissibly with the [executive branch's] performance of its constitutionally assigned function," INS v. Chadha, 462 U.S. 919, 963, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (Powell, J., concurring in the judgment), and blurs

accountability for responsibilities assigned to the courts.[20]

The Supreme Court has recognized the separation of powers as a crucial, but somewhat flexible, requirement:

> [W]hile our Constitution mandates that "each of the three general departments of government [must remain] entirely free from the control or coercive influence, direct or indirect, of either of the others," the Framers did not require—and indeed rejected—the notion that the three Branches must be entirely separate and distinct.

Mistretta, 488 U.S. at 380, 109 S.Ct. 647 (quoting Humphrey's Ex'r v. United States, 295 U.S. 602, 629, 55 S.Ct. 869, 79 L.Ed. 1611 (1935)). Because "our constitutional system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence," id. at 381, 109 S.Ct. 647, the commingling of functions among branches has concerned the Court only when commingling poses the danger of "encroachment" (that is, when it threatens to "undermine the authority and independence of one or another coordinate branch," id. at 382, 109 S.Ct. 647) or "aggrandizement" (as occurs when one branch seeks "powers more appropriately diffused among separate Branches," id.). Here, the government contends that the Standing Order encroaches on its authority and independence. We therefore must consider whether the Standing Order so disrupts the proper balance that it prevents the executive branch from fulfilling its constitutional

---

**20.** The government also argues that the Standing Order violates the United States' sovereign immunity because it effectively results in a transfer of funds from the government without a waiver of immunity. We view this claim as a mere variation on the government's argument that the separation of powers prevented the court from exercising administrative control over the United States Attorney. Cf. Clinton v. Jones, 520 U.S. 681, 697, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (noting that, in his immunity argument, the President did not claim that he was "above the law" and that "[h]is argument is grounded in the character of the office that was created by Article II of the Constitution, and relies on separation-of-powers principles").

duties. *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 751 (9th Cir.1993). We conclude that it does not.

█ First, we interpret § 994(w)(1) and the Standing Order to impose duties closely connected to the sentencing process in each criminal case. This interpretation obviates the government's separation of powers concerns. That is, a court does not violate separation-of-powers principles by compelling the assistance of the United States Attorney, an officer of the court, in a judicial proceeding to which the United States is a party. The United States Attorney has responsibilities as a member of the executive branch, but *also* has duties as an officer of the court. *See United States v. Hilario*, 218 F.3d 19, 27 (1st Cir.2000) ("[W]hile United States Attorneys are admittedly part of the Executive Branch, they also are officers of the court who serve the Judicial Branch."); *see also Newman v. United States*, 382 F.2d 479, 481 (D.C.Cir.1967) ("An attorney for the United States, as any other attorney, however, appears in a dual role."). Fulfilling the latter duties does not impair the government's ability to accomplish the former.

Second, as a factual matter, we see no sign that complying with the Standing Order will impair the executive branch's ability to fulfill its constitutional duties. As we discussed above, the obligation is similar in nature to many already imposed on the United States Attorney in connection with litigation. And, as we will discuss below, the administrative burdens of complying with the Standing Order, on the record before us, appear to be minimal.

One final consideration supports our conclusion. By interpreting § 994(w)(1) as a requirement closely connected to sentencing, and thereby rejecting the government's argument that the Standing Order violates the separation of powers, we fulfill our duty to avoid an unconstitutional interpretation of an ambiguous statute if another plausible reading is constitutional. *See INS v. St. Cyr*, 533 U.S. 289, 299–300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Were we to hold that compliance with § 994(w)(1)'s reporting requirement was so unconnected to the core functions of the judiciary that the court could not exercise its usual authority to compel the assistance of a litigating party in a judicial proceeding, the question would arise whether the reporting requirement *itself* was sufficiently connected to the "central mission of the Judiciary," *Mistretta*, 488 U.S. at 388, 109 S.Ct. 647, to survive a separation-of-powers challenge. This separation-of-powers issue logically precedes the question raised by the government: whether the court's delegation of these functions *back* to the United States Attorney, who represents a litigant in every federal criminal case, is constitutionally permissible.

In sum, § 944(w)(1) may be read to impose a task that is closely related to the central mission of the judicial branch—that is, record-keeping in connection with each individual federal criminal case. If we read the statute in that manner, it is constitutional, and the district court may employ its usual powers to accomplish this case-related task without running afoul of the separation of powers. If we were to read the statute to impose a task that is *not* related closely to the central mission of the judicial branch, it may well be unconstitutional, *Mistretta*, 488 U.S. at 389, 109 S.Ct. 647, and we therefore read the statute—assuming it is ambiguous—to avoid the problem.

D. *The district court did not abuse its discretion.*

█ In addition to the arguments concerning the court's authority to issue the Standing Order, the government makes

one additional argument: that the Standing Order is an abuse of discretion because it is unduly burdensome. The government points out that there were about 600 criminal cases in the District of Montana in 2003 and that the compilation of sentencing reports consumed the equivalent of one-third of the time of one full-time employee in that District's probation department. The government also expresses concern that the court's statement of reasons theoretically may not be received within the 20–day deadline imposed by the Standing Order, although the record contains no evidence that in any particular case such a delay actually occurred or could be expected to occur.

These concerns do not convince us that the Standing Order is an abuse of discretion. The burdens on the government in the District of Montana are not so great as to make the Standing Order an abuse of discretion, and the concern that the district court's own timing will make the United States Attorney's task impossible is, at this time, only hypothetical.

For the foregoing reasons, we hold that the Standing Order represents a valid exercise of the district court's authority and we therefore AFFIRM the district court's order denying the government's Motion to Set Aside the Standing Order.

CLIFTON, Circuit Judge, concurring in part and dissenting in part:

Mark Twain, an always insightful observer of human nature, once said that "work consists of whatever a body is obliged to do." Of course, he also said that "work is a necessary evil to be avoided." Most people possess a natural tendency to embrace Twain's latter observation by shifting the burden to others, when they can. In this instance, however, the recipient of the assignment is unhappy about it and has declined to take it on without a fight, leaving us to decide whether the burden can be shifted.

Despite the explicit obligations placed by the statute upon district courts, and district courts *alone,* to "submit" sentence reports to the Sentencing Commission, the district court here ordered the U.S. Attorney's office to assemble and compile the sentence reports of defendants in *all* criminal cases, leaving the district court with the relatively minor task of mailing the reports. The majority upholds the district court's order by interpreting the "submit" requirement as either not explicitly requiring the district court to assemble and compile sentence reports, or in the alternative, as implicitly authorizing the district court to slough all of the associated assembling and compiling tasks off to the U.S. Attorney's office. Though shifting our obligations to others helps us to avoid Twain's evil—having to do the work ourselves— sometimes it is necessary to accept an imposed obligation for what it is: a work assignment to be done. Because I believe that the majority's interpretation conflicts with the text of the statute, the history of the statute and of the Sentencing Commission's interpretation of the prior version of the statute, and the constitutional avoidance doctrine, I respectfully dissent from the conclusion and from Section IV of the majority opinion.[1]

At the outset, we need to recognize that what this case presents is primarily a question of statutory interpretation. There are constitutional implications lurking in the background, including a question

---

1. I agree that our court has jurisdiction to entertain this appeal and join Judge Graber's opinion with regard to that issue (discussed in Section II of her opinion). I also concur in her description of the background of the case (Section I) and the standard of review (Section III).

about the authority of the court to assign this task to an agency of the executive branch. I will note that concern below, for I believe the constitutional avoidance doctrine supports the result I would reach. It is important to recognize, however, that there is not a serious argument here that what Congress has enacted is unconstitutional. The district court in this case did not hold that 28 U.S.C. § 994(w)(1) was unconstitutional or that Congress did not have the power to assign to the district court the task set forth in that statute. The Supreme Court's decision in *Mistretta v. United States,* 488 U.S. 361, 388–89, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), made clear that Congress could assign administrative responsibilities to courts without running afoul of the separation of powers doctrine.

If the question is one of statutory interpretation, then our goal should be to interpret the statute consistently with congressional intent. "We interpret a federal statute by ascertaining the intent of Congress and by giving effect to its legislative will." *Hernandez v. Ashcroft,* 345 F.3d 824, 838 (9th Cir.2003) (quotation marks and citations omitted). If the words used do not seem sufficiently clear to us, then we must determine what Congress intended when it enacted the statute. As explained below, I cannot conclude that Congress intended to authorize the court to limit itself to mailing the report to Washington, while foisting the remainder of the work onto the U.S. Attorney. If that was what Congress intended, it would have written the statute differently.

## A. Statutory Text

The statute states that the "Chief Judge of each district court shall ensure that, within 30 days following entry of judgment in every criminal case, the *sentencing court* submits to the Commission a written

report of the sentence." 28 U.S.C. § 994(w)(1) (emphasis added). The "sentencing court" involved here is the U.S. District Court for the District of Montana. Because § 994(w)(1) is silent on any prefatory compilation or assembly tasks, the majority interprets the "submit" provision as only requiring the district court to mail the sentence reports to the Sentencing Commission. The district court is permitted to require the U.S. Attorney's office to do everything else, for every case. That interpretation is not a logical reading of the statute. It is contrary to the plain meaning of "submit" as used within the PROTECT Act's framework and is in tension with other provisions of the Act requiring the Department of Justice (DOJ) to "submit" similar reports.

To "submit" means to "present or propose to another for review, consideration, or decision." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, TENTH EDITION 1169 (1993); *see also* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE: FOURTH EDITION (2000) (defining "submit" as "[t]o commit (something) to the consideration or judgment of another."). The majority's interpretation of the "submit" requirement as only encompassing the relatively simple and undemanding task of mailing the reports effectively jettisons all associated tasks involved with "presenting" the sentence reports. Courts have interpreted the word "submit" to have a broader meaning than the mere mailing of information. *See Withers v. U.S. Postal Serv.,* 417 F.Supp. 1, 6 n. 4 (W.D.Mo.1976) ("Assuming the general purpose of the appellate procedures is to promote the prompt resolution of employment disputes (to the benefit of both employee and employer),[the] interpretation of 'submits' to mean the mere act of mailing the letter of appeal would often result in delay and confusion."); *Am. Pac. Roofing Co. v. United States,* 21 Cl.Ct. 265, 267 (1990) ("The term

'submit' means 'to commit to another (as for decision or judgment)'.... 'Submit' is not entirely synonymous with the words 'address' or 'directly send.'")

As the majority itself notes, where a statute confers powers or duties in general terms, all powers and duties incidental and necessary to make such legislation effective are included by implication. 2B NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION 388, § 55.04 (6th ed.2000). Given that the statute is otherwise silent on the associated tasks of assembling and compiling the reports, interpreting the submit requirement *not* to implicitly contain these duties would render § 994(w)(1) effectively meaningless: one cannot "submit" the sentence reports without first assembling and compiling them. *See United States v. Powell,* 6 F.3d 611, 614 (9th Cir. 1993) (noting that it is a "basic rule of statutory construction that one provision should not be interpreted in a way which ... renders other provisions of the same statute inconsistent or meaningless" (internal quotation marks and citation omitted)). Indeed, the majority acknowledges that the sentencing reports will have to be prepared or assembled so that it will be possible to submit them. *See* Majority Op. at 990–91.

The majority's interpretation of the "submit" requirement is further undermined by the fact that the PROTECT Act imposes a separate though similar obligation upon the DOJ to "*submit* a report [regarding sentencing ] to the Committees on the Judiciary of the House of Representatives and the Senate." PROTECT Act, § 401(*l* )(2), 117 Stat. 675 (codified at 18 U.S.C. § 3553).[2] That Congress chose the same language—the word "submit"—to instruct the courts and the DOJ to fulfill similar reporting obligations suggests that Congress intended the word "submit" to encompass all associated prefatory tasks with the "submit" requirement. Indeed, if "submit" only entailed mailing the reports, who would assemble and compile the reports for the DOJ? Employees of the DOJ, of course. While Congress could have specified "assembling" or "compiling" tasks in the statute, its failure to do so is not a reason to believe that it intended the word "submit" to give the district court the unfettered discretion to assign such tasks outside the judiciary. Why would Congress go to the trouble of specifying who should mail the report to the Sentencing Commission if that is all that "submit" means? Why would it matter to Congress who mailed the report, if Congress did not care who put it together? The majority's narrow definition of the word "submit" is not a plausible interpretation of the statute.

The majority's interpretation also contravenes established principles of statutory interpretation. The PROTECT Act's imposition of separate reporting requirements upon the courts and the DOJ demonstrates that Congress is not only capable of distinguishing between the two entities,

**2.** Under certain circumstances, the statute requires the Attorney General to submit a report, setting forth: "(i) the case; (ii) the facts involved; (iii) the identity of the district court judge; (iv) the district court's stated reasons, whether or not the court provided the United States with advance notice of its intention to depart; and (v) the position of the parties with respect to the downward departure, whether or not the United States has filed, or

intends to file, a motion for reconsideration." PROTECT Act, § 401(*l* )(2), 117 Stat. 675 (codified at 18 U.S.C. § 3553). While the procedures recently adopted by the Justice Department do not require ongoing reports to Congress, they nonetheless add substantial new internal reporting obligations. *See* § 9–2.170B of U.S. Attorneys' Manual (rev. July 28, 2003) (available at www.usdoj.gov/usao/eousa/foia_reading_room/usarn/title9).

but that if it had intended for the U.S. Attorney to compile the reports and the district court merely to mail them, it could have clearly said so in the statute. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). One established canon of statutory interpretation is *expressio unius est exclusio alterius*, the expression of one thing implies the exclusion of others. Because Congress listed "sentencing courts" as the exclusive actor responsible for complying with the statutory provision, we should presume that it made a decision to assign the duties imposed by § 994(w)(1) to district courts, and not to the DOJ. *See Perdomo–Padilla v. Ashcroft*, 333 F.3d 964, 970 (9th Cir.2003) (noting that the canon of " '*expressio unius est exclusio alterius* ... as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions.' ") (quoting *Boudette v. Barnette*, 923 F.2d 754, 756–57 (9th Cir.1991)). Indeed, "a situation in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (citation and quotation marks omitted). Where a statute specifically names the parties granted the power to act, "such parties *only* may act." *Id.* at 7, 120 S.Ct. 1942 (emphasis added). The current case is somewhat different, in that we are identifying which party is assigned a responsibility, rather than which is given the power

to take certain action, but the broader principle is the same. When Congress assigned this responsibility, it referred only to the district court and not to any executive agency.

The majority's contention that the principle *expressio unius est exclusio alterius* could just as reasonably support the proposition that if Congress cared how the sentencing court prepared or compiled the reports, it would have expressly assigned those duties to the court, misses the mark. This argument incorrectly presumes that the word "submit" only entails the mailing of the sentence reports. Though it is possible to read the words that way, it is implausible that this is what Congress intended. Given that the "submit" requirement necessarily entails all associated tasks with mailing the sentence reports, a more accurate application of *expressio unius est exclusio alterius* is that if Congress desired the U.S. Attorney's office to do the majority of such tasks, it would have clearly said so in the statute.

Nor does the statutory text support the majority's alternative argument that even if the "submit" requirement entails associated prefatory tasks, the district court had the implicit authority to compel the U.S. Attorney's office to assist it. Section 994(w)(1) instructs the Chief Judge of each district court to "ensure" that "the sentencing court" complies with the reporting requirements. This phrase cannot reasonably be read to empower district courts to impose the bulk of the responsibility on the U.S. Attorney.

If Congress simply intended that the Chief Judge, or the district court, ensure that a report was submitted for each sentence, leaving it up to the Chief Judge or the court to determine how best to do that, the statute could have been worded that way, but that is not what Congress enacted. The majority's interpretation

might also be viable if the statute read, for instance, that "the Chief Judge of each district court shall ensure that a written report of sentence is submitted to the Commission within 30 days following entry of judgment in every criminal case." But that is not what the law says, either. The statute does not just say that the Chief Judge or the court shall ensure that the reports are sent. It says that the *Chief Judge* shall ensure that the *sentencing court* shall submit the reports. The judicial branch is referred to twice, while there is no reference at all to any other agency or to the executive branch. To draw from that statute authority to devise a system that puts almost all of the work on the executive branch—everything except dropping the envelope in the mailbox—is a highly unlikely interpretation of what Congress intended.

Though it is true that where a statute confers powers or duties in general terms, all powers and duties incidental and necessary to make such legislation effective are included by implication, the phrase "shall ensure" cannot be fairly interpreted as conferring broad, unlimited authority on the Chief Judge of each district to require another independent branch of government, *unmentioned* in § 994(w)(1), to prepare the entire sentence report for the court, on a routine basis, in each and every case.[3] Indeed, none of the cases cited by the majority in support of this proposition—*Thomas v. INS*, 35 F.3d 1332, 1339 (9th Cir.1994), *United States v. Jones*, 204 F.2d 745, 754 (7th Cir.1953), *In re Permi-*

an *Basin Area Rate Cases*, 390 U.S. 747, 776–77, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)—involve a government actor, explicitly identified in the statute, shifting its statutorily required duties to another actor, unmentioned in the statute.

## B. The Prior Version of Section 994(w) and the 2003 Amendment

The majority inappropriately disregards a widely accepted interpretation held by the Sentencing Commission of a prior version of § 994(w) that sensibly concluded that those entities that are *explicitly identified* in the statute to "submit" sentence reports are expected to compile, assemble, and mail the reports. The earlier version of § 994(w) provided, in pertinent part, that "[t]he appropriate judge or officer shall submit to the Commission in connection with each sentence imposed ... a written report of the sentence." 28 U.S.C. § 994(w) (2000). The Sentencing Commission interpreted the "appropriate judge or officer" language of the earlier version of § 994(w) to refer solely to district court judges and other "court personnel." *See* Memorandum from Administrative Office of the United States Courts and the Sentencing Commission, to Chief Judges, United States District Courts; District Court Executives; Clerks, United States District Courts; Chief Probation Officers (March 12, 1997) [*Memorandum of Understanding*] ("[P]ursuant to 28 U.S.C. § 994(w), *court personnel* are required to submit to the United States Sentencing

---

**3.** I do not believe that it would be beyond the court's authority to require assistance from the U.S. Attorney—or any other party in litigation before it—in appropriate individual cases. If, for example, the clerk's office was unable to locate or obtain a particular file on a timely basis, the court could properly order a party to a case, including the government, represented by the U.S. Attorney, to provide copies of documents or otherwise to assist.

Since the U.S. Attorney's office presumably keeps a complete file on all aspects of a prosecution, it would be the logical party to enlist if such assistance were needed, on a case-by-case basis, in compiling the sentence reports. But an order applied that compels the U.S. Attorney's office to complete the reports in all cases is not, in my opinion, a reasonable interpretation of § 994(w)(1).

Commission certain sentencing information and documents") (emphasis added). In detailing methods of compliance with § 994(w)'s reporting requirements, the Sentencing Commission has *consistently* interpreted the provision to apply to the court personnel of the probation offices of each judicial district. *See* U.S. SENTENCING COMMISSION 2002 ANNUAL REPORT 39 (2002) ("Pursuant to its authority under 28 U.S.C. § [ ] 994(w) ... the Commission requested that the *probation office* in each judicial district submit the following documents on every offender sentenced under the guidelines") (emphasis added) U.S. SENTENCING COMMISSION 2001 ANNUAL REPORT 41 (2001) (same); U.S. SENTENCING COMMISSION 2000 ANNUAL REPORT 39 (2000) (same); U.S. SENTENCING COMMISSION 1999 ANNUAL REPORT 39 (1999) (same); U.S. SENTENCING COMMISSION 1998 ANNUAL REPORT 35 (1998) (same); U.S. SENTENCING COMMISSION 1997 ANNUAL REPORT 33 (1997) (same); U.S. SENTENCING COMMISSION 1996 ANNUAL REPORT 31 (1996) (same); U.S. SENTENCING COMMISSION 1995 ANNUAL REPORT 33 (1995) (same). As of 1997, "most" districts complied with this request. *See Memorandum of Understanding.*[4]

The majority fails to point to any evidence that a district court or probation office had a policy of delegating the compiling tasks to U.S. Attorneys' offices or any other entity not explicitly identified in the prior version of § 994(w).[5] Congress's amendment of § 994(w) without explicitly altering or repealing this existing interpretation suggests that Congress intended to embody that practice. *See Lindahl v. Office of Pers. Mgmt.,* 470 U.S. 768, 783 n. 15, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change. So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute" (citations and quotation marks omitted)). The Supreme Court has emphasized that the presumption applies not only to adoption of the interpretation, but also to awareness of its existence. *See Lorillard v. Pons,* 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("Congress normally can be presumed to have had *knowledge* of the [administrative] interpretation given to the incorporated law, at least insofar as it affects the new statute" (emphasis added)).

---

4. A 1997 Memorandum of Understanding between the Administrative Office of the U.S. Courts and the Sentencing Commission noted that "[m]ost districts" complied with § 994(w) by "ask[ing] the probation office to submit the sentencing documents." *Memorandum of Understanding.*

5. The majority does note that the 1997 *Memorandum of Understanding* states that "the Chief Judge may want to meet with the United States Attorney's office and others to decide on the most efficient way to submit" information. This Memorandum of Understanding, however, notably limited such instances to those "where the probation office is not involved in the proceeding" and where there are "changes to the judgment that result from, for example, Rule 35 motions, retroactive amendment motions, post-conviction relief motions, and resentencing on remand from an appellate court." *Memorandum of Understanding.* As described above, I also read § 994(w)(1) to permit the occasional, ad hoc reliance on U.S. Attorney's offices in compiling the reports where necessary, as in the above contexts. My principal disagreement lies with the categorical approach that the majority has taken in upholding Standing Order DWM–28. In any event, despite this internal memorandum, the U.S. Sentencing Commission as recently as 2002 publicly requested in its Annual Report that the probation office of each district submit the sentence reports.

As for whether it is reasonable to presume Congressional awareness of an administrative interpretation of a statute, the U.S. Sentencing Commission Annual Reports put Congress on notice as well as administrative regulations, as to which that presumption is well-established. *See Bragdon v. Abbott,* 524 U.S. 624, 631–32, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (applying the presumption to published regulations); *Conn. Dep't of Income Maint. v. Heckler,* 471 U.S. 524, 531–32, n. 17, 105 S.Ct. 2210, 85 L.Ed.2d 577 (1985) (published regulations consistent with earlier less formal interpretations); *Palila v. Haw. Dep't of Land & Natural Res.,* 852 F.2d 1106, 1109 n. 6 (9th Cir.1988) (published administrative regulations). The Annual Reports are actually distributed to members of Congress, and Congress itself specifically requested the portion of these reports analyzing and interpreting 28 U.S.C. § 994(w). *See* U.S. SENTENCING COMMISSION 2001 ANNUAL REPORT 17 (2001) (noting that the "Commission also supplie[s] numerous Commission publications and resource materials to members of Congress and their staffs"); 28 U.S.C. § 994(w) (earlier version) ("The Commission shall submit to Congress at least annually an analysis of these reports and any recommendations for legislation that the Commission concludes is warranted by that analysis."). It is certainly reasonable to assume that Congress actually read the materials describing the implementation of § 994(w) that it had specifically requested.

Though there is no legislative history regarding the 2003 amendment, it can be reasonably inferred that a driving force behind the amendment was to improve compliance with the reporting requirements of § 994(w). Prior to the 2003 amendment, some circuits had failed to provide complete sentence reports as required by the statute in as many as 17 per cent of the cases. *See, e.g.,* U.S. SENTENC-

ING COMMISSION'S SOURCE-BOOK OF FEDERAL SENTENCING STATISTICS: DOCUMENT SUBMISSION RATE OF EACH CIRCUIT AND DISTRICT, FISCAL YEAR 2001 (2001) *available at* http://www.ussc.gov/ANNRPT/2001/table1.pdf (First Circuit, 10.7% of cases; Fourth Circuit, 17.3%; Ninth Circuit, 14.5%; Tenth Circuit, 11.6%).

Congress could have turned to the DOJ, including the U.S. Attorneys' offices across the country, to address that problem. The government is necessarily a party to every case which results in a criminal sentence, so Congress could have assigned the responsibility for preparing and sending the required reports to the DOJ. As noted above, elsewhere in the PROTECT Act the Attorney General was handed the task of submitting certain reports, so there can be no doubt that Congress was aware of the DOJ as a possibility. Alternatively, Congress could have decided that the courts and the prosecutors should be made jointly responsible for getting the sentence reports in, or should divide the task between them, or some other variation. But Congress did none of those things. Instead it replaced the reference to the "appropriate judge or judicial officer" in the previous version of the statute with *two* separate references to the judiciary, requiring the "Chief Judge" of each district to ensure that the "sentencing court" submits the sentence reports. Congress presumably decided that the way to improve accountability and compliance with § 994(w) was to leave the submission responsibilities centralized within the judiciary and to explicitly call upon the Chief Judge of each district to *ensure* that the job got done. The majority's interpretation of the statute, permitting the district court to shift the central duties to the U.S. Attorney's office, is actually a step in the other direction and cannot be squared with the 2003 amendment to the statute.

## C. The Constitutional Avoidance Doctrine

Given that the majority expends a considerable amount of ink arguing that Standing Order DWM–28's shifting of administrative tasks from district courts to the U.S. Attorney's office does not violate the Constitution, it is evident that this case raises non-frivolous constitutional questions. The constitutional avoidance doctrine instructs us to interpret § 994(w)(1) in a manner that avoids difficult constitutional issues. *See Jones v. United States,* 526 U.S. 227, 239, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided,[a court's] duty is to adopt the latter."). The Ninth Circuit has referred to this rule as a "paramount principle of judicial restraint." *United States v. Restrepo,* 946 F.2d 654, 673 (9th Cir.1991). Similarly, the "clear statement rule" requires that Congress expressly and unequivocally state its intention to alter core constitutional balances (such as those that inhere in the separation of powers doctrine), something that Congress has clearly not done here. *See, e.g., Gregory v. Ashcroft,* 501 U.S. 452, 461, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("[I]n traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.").

The majority's construction of § 994(w)(1) to give the district court carte blanche to delegate the bulk of its duty under the statute to the U.S. Attorney's office inappropriately forces the court to confront constitutional issues, contravening this fundamental rule of statutory interpretation.

## D. Conclusion

I am sympathetic to the situation faced by the district court in Montana. Each court has to deal with different problems. The geographic spread of the District of Montana surely complicates its administrative task. The entire judiciary is facing a serious budget crunch due to inadequate appropriations, making the situation today probably even more difficult for the district court than it was when the Standing Order was adopted. It should not be surprising that the assignment by Congress of administrative burdens without sufficient funding to maintain operations will leave Chief Judges and court administrators grumbling about unfunded mandates in terms that may not be very polite. But that does not give us leave to interpret this statute in a way that Congress did not intend, even though it would be helpful for the courts.

The statute explicitly obligates district courts, and district courts *alone,* to "submit" sentence reports to the Sentencing Commission. Because the majority's interpretation conflicts with the text of the statute, the history of the statute, and the constitutional avoidance doctrine, I am regrettably unable to join my colleagues in Section IV of the majority opinion. I would instead reverse the July 29, 2003 order and remand with instructions to vacate Standing Order DWM–28.

BREWSTER, Senior District Judge, Dissenting in Part and Concurring in Part:

## I. SUMMARY

The members of the panel see this case in three different postures. Graber, J. would AFFIRM the district court order of July 29, 2003, denying the government's motion to set aside Standing Order DWM–28. Clifton, J., DISSENTING IN PART

and CONCURRING IN PART, would REVERSE the district court order of July 29, 2003, and remand to the district court with instructions to vacate Standing Order DWM–28. I would VACATE the district court order of July 29, because the district court lacked subject matter jurisdiction to hear the government's motion to set aside the Standing Order. Therefore, I would necessarily reach the government's alternative mandamus petition and would DENY the writ.

Because a majority of the panel finds the district court had subject matter jurisdiction in the context of the *Ray* case to enter its order of July 29, 2003 denying the U.S. Attorney's motion to set aside Standing Order DWM–28, it is incumbent upon me on that issue alternatively to address the July 29, 2003 order before us on the merits, which in turn requires the analysis of Standing Order DWM–28 on its merits. In that analysis I concur with section IV of the Graber, J. opinion which would affirm the July 29, 2003 order of the district court. That makes the Graber, J. opinion the majority opinion. The basis for my dissent follows.

## II. JURISDICTION

The panel unanimously finds we have appeal jurisdiction under 28 U.S.C. § 1291 to review the *only* order on appeal here— the July 29, 2003 order of the district court which denied the motion of the U.S. Attorney to set aside Standing Order DWM–28.

My colleagues find that the district court below had subject matter jurisdiction to hear the U.S. Attorney's motion to set aside Standing Order DWM–28, filed in the case of *U.S. v. Ray*, a position from which I respectfully dissent. The premise for my colleagues' conclusion of district court jurisdiction to enter the July 29, 2003 order is that the order is a post-judgment order arising out of the *Ray* case and

collateral to it, with which I disagree. Then my colleagues, considering the district court's July 29 order (and therefore Standing Order DWM–28) on its merits, reach opposite conclusions, Graber, J., AFFIRMING and Clifton, J., REVERSING that July 29, 2003 Order.

I contend the July 29, 2003 Order of the district court should be VACATED because it is not a post-judgment order, as it has no substantive nexus with any rights or obligations of the parties to that concluded criminal case. The U.S. Attorney's motion was improperly brought in the *Ray* case, and should have been dismissed without prejudice by the district court for lack of subject matter jurisdiction of the court *sitting in the Ray case*.

A. THE DISTRICT COURT ORDER OF JULY 29, 2003 SHOULD BE VACATED, SINCE THE DISTRICT COURT LACKED SUBJECT MATTER JURISDICTION IN THE *RAY* CASE TO DECIDE THE MOTION FILED BY THE U.S. ATTORNEY IN THAT CASE.

The district court would have subject matter jurisdiction over the U.S. Attorney's motion only if the motion pertained to some adjudicatory function of the district court arising in the *Ray* case. Many such examples appear in cases involving post-judgment orders and proceedings, but all of the circumstances involve rights and liabilities of parties or witnesses to the litigation, such as: 1) Orders for disposition of evidence, exhibits, property of parties or witnesses after the trial as a post-judgment detail; 2) Post-judgment orders concerning compensation of parties, witnesses, counsel, and other entitled persons; 3) Orders concerning post-judgment custody pending appeal; and 4) Orders result-

ing from post-judgment civil contempt hearings.[1]

All of these subjects are matters of rights and obligations, and all interested persons have standing to be heard to assure that the orders do not violate due process rights of anyone connected with the disposition of the case.

All cases found concerning post-judgment orders set forth the central requirement of post-judgment orders—that they have a substantive, not merely a temporal nexus to rights and liabilities of parties or other persons. *See e.g., Watson v. County of Riverside*, 300 F.3d 1092, 1095 (9th Cir. 2002) (an award of attorneys' fees); *United Nuclear Corporation v. Cranford Insurance Company*, 905 F.2d 1424 (10th Cir.1990) (post-judgment modification of a protective order); *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1145 (9th Cir.1983) (a postjudgment civil contempt order imposing sanctions); *Allen v. Minnstar, Inc.*, 8 F.3d 1470 (10th Cir.1993) (post-judgment order denying motion to supplement the record for appeal). *American Ironworks & Erectors Inc. v. North American Construction Corporation*, 248 F.3d 892 (9th Cir.2001) (postjudgment order disbursing funds from the court registry).

In contrast, the subject of the U.S. Attorney's motion had nothing to do with any rights or liabilities of the parties to the *Ray* case. The sentencing report is an administrative task mandated by § 994(w)(1) to the district court to submit historical empirical data on each closed criminal case to another Article III agency—the Sentencing Commission—for its possible use as a tool of oversight and improvement of the criminal sentencing function of the federal courts into the future. The report of sentence is not filed in any criminal case, and it has no effect on the conviction which it is reporting to the Commission. The Standing Order of the district court which orders the U.S. Attorney to assemble the contents of the report of sentence and file it with the Court Clerk within twenty days of each judgment of conviction likewise has nothing to do with any rights or liabilities connected to any criminal case and is not issued out of any particular case. It has no more relationship to the *Ray* case than, for example, would a standing order tasking the U.S. Attorney to provide janitorial services to clean up the courtroom and all its furniture after each criminal case. I have been unable to find any case holding an order unrelated to any rights or liabilities of parties or witnesses to be a post-judgment order.[2]

---

1. The majority's opinion draws an analogy between tasks that district courts regularly require litigants to complete, such as proposed findings of fact, and the written report of sentence that Standing Order DWM–28 requires Petitioner to prepare. An order requiring a litigant to prepare findings of fact, however, is not a post-judgment order, but a post-trial prejudgment order. Additional examples of post-trial, pre-judgment orders include briefing motions, preparing proposed jury instructions, preparing proposed form of judgment announced by the trial court, preparing writs and subpoenas compelling witness attendance, preparing bail conditions announced by the Court, etc. Notably, all of these tasks can be distinguished from the Standing Order at issue before this panel, because these tasks all arise out of the underlying case and have a nexus to the rights and liabilities of the parties, in addition to being pre-judgment orders.

2. Ironically, if the Standing Order at issue here were a post-judgment order, it would not be an appealable order, as post-judgment orders that are purely ministerial in nature do not meet the requirements of 28 U.S.C. § 1291. *See Blossom v. The Milwaukee & Chicago Railroad Co.*, 1 Wall. 655, 68 U.S. 655, 17 L.Ed. 673 (1863) (stating that "where the act complained of was a mere ministerial duty, necessarily growing out of the decree which was being carried into effect, no appeal would lie"); *American Ironworks & Erectors*,

Nor is Standing Order DWM–28 analogous to orders of the court regulating grand juries, approving search warrants, and reviewing wiretap warrant applications, all of which are reviewed and appealable by parties to criminal proceedings, and all of which involve constitutional protections to the accused. Those matters truly are at the very central core of the adjudicatory process, but none of these concerns attaches to the Standing Order at issue here.

I conclude that the Standing Order was not at all related to the *Ray* case, and if not, then the motion by the U.S. Attorney to set aside the Standing Order was not within the jurisdiction of the *Ray* case. Under those circumstances, the district court should have dismissed the motion for lack of subject matter jurisdiction instead of considering it on its merits and entering an order addressing the global merits of the Standing Order for all criminal cases in the District of Montana in the future.

For these reasons, I would **VACATE** the Order denying the U.S. Attorney's motion to set aside Standing Order DWM–28 and **REMAND** to the district court handling the case of *U.S. v. Ray* with instructions to dismiss the U.S. Attorney's motion for lack of subject matter jurisdiction in that case.

### III. WRIT OF MANDAMUS

The above disposition would have necessitated the panel's consideration of the petition for writ of mandate had it been the majority position of the panel.

*Inc. v. North American Construction Corp.,* 248 F.3d 892, 898 (9th Cir.2001) (stating that "[a] mere ministerial order, such as an order executing judgment or, in this case, an order to disburse funds from the court registry, is not a final appealable order"). Accordingly, if this Court were to treat Standing Order

Section IV of the Majority Opinion analyzes all of the challenges to the Standing Order presented by the U.S. Attorney, including the constitutional challenge under the separation of powers doctrine, and that analysis would have applied equally to a mandamus review. Although we do not reach the mandamus issue because we have a majority on the § 1291 appeal, were we required to reach the Mandamus issue I would deny it based on the Section IV analysis with which I concur.

DWM–28 as a post-judgment order, it would have to dismiss the instant appeal as we do not have jurisdiction to hear appeals of orders that are merely ministerial in nature. Such a result would require the Court to consider the challenge of the Standing Order under mandamus.