**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellant/ Cross-Appellee*, | Nos. 14-16942 14-16943 14-16944 14-17047 14-17048 14-17185 |
| and | |
| GILA RIVER INDIAN COMMUNITY; SAN CARLOS APACHE TRIBE OF ARIZONA, *Intervenor-Plaintiffs-Appellants/Cross-Appellees*, | D.C. Nos. 4:31-cv-00059-SRB 4:31-cv-00061-SRB |
| v. | OPINION |
| GILA VALLEY IRRIGATION DISTRICT; FRANKLIN IRRIGATION DISTRICT; FREEPORT MINERALS CORPORATION; LARRY W. BARNEY; VIRI VIVA LUNT REVOCABLE TRUST; TRP FAMILY TRUST; RONALD HOWARD; JANICE HOWARD; MYRNA CURTIS; JOE B. TATUM; JUDY L. TATUM; HARRINGTON RANCH AND FARM; S&R DALEY, LP; STEVE DALEY; ROSS AND FAWN BRYCE FAMILY TRUST; HOUSEHOLDER FAMILY | |

LIMITED PARTNERSHIP; KENNETH
CLARIDGE,
            *Defendants-Appellees/*
                *Cross-Appellants.*

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted December 15, 2016
San Francisco, California

Filed June 13, 2017

Before:  Diarmuid F. O'Scannlain, Ronald M. Gould,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge O'Scannlain

# SUMMARY[*]

## Water Rights

The panel affirmed in part, and reversed in part, the district court's September 4, 2014 judgment in these consolidated appeals involving the Globe Equity Decree of 1935, and concerning whether landowners can transfer their rights to divert water from the Gila River, which flows through southern Arizona; and dismissed the cross appeals.

In 1935, the district court entered a consent decree, the Globe Equity Decree, to govern the distribution of water among the Gila River Indian Community, the San Carlos Apache Tribe, and various other landowners. The district court has continuing jurisdiction to enforce and interpret the Decree.

In 2007, the Community, the San Carlos Irrigation and Drainage District, the United States, and thousands of individual landowners entered into the Upper Valley Forbearance Agreement providing that the individual landowners could sever and transfer certain water rights. Pursuant to the Agreement, in 2008, fifty-nine sever and transfer applications were filed by Freeport Minerals Corporation, and the remaining parties filed objections. In a Freeport sub-docket, the district court denied Freeport's initial ten applications. The district court then adjudicated other sever and transfer applications filed in 2008, and eventually resolved Freeport's remaining applications. The district court entered its final judgment with respect to all of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the 419 sever and transfer applications filed in 2008, and it was applicable to both the main docket and the Freeport sub-docket.

Turning to jurisdiction questions, the panel held that it lacked jurisdiction over the applications and associated objections of non-Freeport applicants because the applications and accompanying objections filed by the non-Freeport defendants were voluntarily withdrawn or dismissed without prejudice. Additionally, concerning the non-Freeport defendants, the panel held that because there were ongoing sever and transfer applications being litigated on the main docket, the district court should have complied with Fed. R. Civ. P. 54(b). Because the district court did not follow Rule 54(b), the panel held that its September 4, 2014 order was not properly appealable as it related to the main docket. The panel held that no Rule 54(b) finding was required for the Freeport sub-docket because no additional applications remained pending, and concluded that appellate jurisdiction over Freeport's applications and accompanying objections was proper.

Concerning further jurisdictional issues for the Freeport sub-docket appeals, the panel held that jurisdiction was proper over Applications 138, 150, and 162, together with associated counterclaims, along with the counterclaim for Application 147, and the additional fourteen applications appealed by Freeport. The panel left it to the district court to decide in the first instance whether the other six applications and associated counterclaims were moot due to the covenants Freeport entered under the Agreement.

Turning to the merits, the panel held that the district court did not err in holding that Freeport failed to present a prima facie case of no injury to other Decree parties. The panel also held that the district court did not err in denying

Freeport's Fed. R. Civ. P. 15(b)(1) motion to amend its applications to conform to the revised maps it filed during discovery. The panel held that allowing Freeport to amend its applications during closing argument would have resulted in prejudice to the objecting parties, and may have resulted in prejudice to additional parties under the Decree; and such material changes should be made by filing new sever and transfer applications.

The panel held that the district court erred by considering whether Arizona's law of statutory forfeiture, Arizona Revised Statutes § 45-141(C), applied to Freeport's water rights when it concluded that water rights which vested prior to 1919 could not be lost through statutory forfeiture. The panel held that this interpretation was foreclosed by the Arizona Supreme Court's holding in *San Carlos Apache Tribe v. Superior Court ex rel. Cty of Maricopa*, 972 P.2d 179, 187, 204 (Ariz. 1999) (en banc) (holding that statutory forfeiture applied to pre-1919 water rights); and, thus, there was no need for the district court to evaluate further the 1919 water code. The panel left it to the district court on remand to determine in the first instance how statutory forfeiture applied to the remaining objections.

The panel held that the district court did not clearly err in determining that Freeport had abandoned its water rights in 1.4 acres of land that were part of the sever parcel in Application 147 because the creation of (and failure to remove) a road and canal demonstrated an intent to abandon, and because Freeport failed to use its water rights in the land covered by the canal for at least eleven years. The panel held that the district court appropriately tailored its holding by limiting its finding of abandonment to 1.4 acres out of the 15.5 acre parcel.

The panel declined to address in the first instance the question of abandonment of water rights in land that had become riverbed in certain applications.

---

**COUNSEL**

John L. Smeltzer (argued), Katherine J. Barton, F. Patrick Barry, and Yosef Negose, Attorneys, and John C. Cruden, Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Scott Bergstrom and Andrew Engel, Office of the Solicitor, United States Department of the Interior, Washington, D.C.; for Plaintiff-Appellant/Cross-Appellee United States.

Pratik A. Shah (argued), Merrill C. Godfrey, Hyland Hunt, and Z.W. Julius Chen, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C.; Linus Everling and Thomas L. Murphy, Gila River Indian Community, Pima Maricopa Tribe Law Office, Sacaton, Arizona; for Intervenor-Plaintiff-Appellant/Cross-Appellee Gila River Indian Community.

Joe P. Sparks (argued) and Julia Rowen Kolsrud, The Sparks Law Firm P.C., Scottsdale, Arizona, for Intervenor-Plaintiff-Appellant/Cross-Appellee San Carlos Apache Tribe of Arizona.

Sean T. Hood (argued) and Rhett Billingsley, Fennemore Craig P.C., Phoenix, Arizona, for Defendant-Appellee/Cross-Appellant Freeport Minerals Corporation.

Paul F. Eckstein (argued) Shane R. Swindle, and Vidula U. Patki, Perkins Coie LLP, Phoenix, Arizona; David A. Brown, Brown & Brown, St. Johns, Arizona; for Defendant-Appellee/Cross-Appellant Gila Valley Irrigation District and Franklin Irrigation District.

Robert B. Hoffman, Somach Simmons & Dunn, Sacramento, California; for Defendants-Appellees/Cross-Appellants Larry W. Barney, Viri Viva Lunt Revocable Trust, TRP Family Trust, Ronald Howard, Janice Howard, Myrna Curtis, Joe B. Tatum, Judy L. Tatum, Harrington Ranch And Farm, S&R Daley, LP, Steve Daley, Ross and Fawn Bryce Family Trust, Householder Family Limited Partnership, and Kenneth Claridge.

John B. Weldon, Jr., Mark A. McGinnis, Lisa M. McKnight, and Scott M. Deeny, Salmon Lewis & Weldon P.L.C., Phoenix, Arizona, for Amici Curiae Salt River Valley Water Users' Association and Salt River Project Agricultural Improvement and Power District.

**OPINION**

O'SCANNLAIN, Circuit Judge:

In these consolidated appeals involving the Globe Equity Decree of 1935, we must decide whether landowners can transfer their rights to divert water from the Gila River which flows through southern Arizona.

I

A

These cases arise out of litigation that began over ninety years ago. In 1925, the United States first brought suit on behalf of the Gila River Indian Community ("Community") and the San Carlos Apache Tribe ("Tribe"), seeking to adjudicate the water rights involving the Gila River. In 1935, the district court entered a consent decree, known as the Globe Equity Decree ("Decree"), to govern the distribution of water among the Community, the Tribe, and various other landowners. *See United States v. Gila Valley Irrigation Dist.*, 31 F.3d 1428, 1430 (9th Cir. 1994) ("*GVID IV*"). The district court has continuing jurisdiction to enforce and to interpret the Decree, which provides for the appointment of a Water Commissioner for such enforcement purposes.

Parties to the Decree are entitled to divert water from the River for the "beneficial use" and "irrigation" of land in accordance with the specified priorities. The Community and the Tribe have the senior-most water rights (the Community's date from time "immemorial" and the Tribe's date from 1846). Covered parcels of land are described in the Decree by reference to the number of acres located in a quarter-quarter section[1] of the Public Land Survey System. Parties to the Decree are permitted "to change the point of diversion and the places, means, manner or purpose of the use of the waters to which they are so entitled or any part thereof, so far as they may do so without injury to the rights of other parties."

---

[1] A quarter-quarter section is approximately 40 acres.

B

In 1993, the district court entered an order (the "Change in Use Rule") outlining the procedures for severing water rights from one piece of property and transferring them to another. Parties must file a sever and transfer application with the Water Commissioner, who will publish notice of such application. If there are objections filed by other parties to the Decree, either the applicant or the objectors may request an evidentiary hearing before the district court. "The applicant shall have the burden of establishing a prima facie case of no injury to the rights of other parties under the Gila Decree and a right to transfer."

In 1996, the district court entered a Water Quality Injunction, which provides that if the water quality reaching the Tribe deteriorates below certain thresholds, the Water Commissioner is directed to take measures limiting the diversions of water rights holders in the Safford Valley.

In 2001, the Community, the Tribe, the United States, and the San Carlos Irrigation and Drainage District ("SCIDD") jointly filed a post-judgment complaint ("Pumping Complaint") asking the district court to enforce the Decree against thousands of individual landowners ("Upper Valley Defendants" or "UVDs") who, they claimed, were using wells to pump subflow of the river in excess of their decreed rights. In 2007, the Community, the SCIDD, the United States (as plaintiff, but not the Tribe or the United States in its capacity as trustee for the Tribe), and the UVDs entered into the Upper Valley Forbearance Agreement ("UVFA") by which they agreed to dismiss the Pumping Complaint if the UVDs permanently reduced the number of acres they were entitled to irrigate by 1000 acres.

In addition, the UVFA provided that UVDs could sever and transfer water rights from decreed lands to certain "Hot Lands," which had been irrigated but were not covered by the Decree. If property owners filed such good faith applications within six months of the enforceability date of the UVFA, they could continue to irrigate these Hot Lands while their applications were pending. The plaintiffs agreed not to object to properly filed applications.

## C

Pursuant to the UVFA, a total of 419 sever and transfer applications were filed in 2008. Fifty-nine of these were from Freeport Minerals Corporation ("Freeport"), who had begun acquiring decreed lands in 1997. Freeport purchased farms for the express purpose of obtaining water rights, required its tenants to maintain the water rights, and paid all water-related assessments and fees.

The United States, the Tribe, and the Community ("Plaintiffs") filed objections to the sever and transfer applications.[2] After receiving proposals from the interested parties on the best way to manage so many applications, the district court began by adjudicating Freeport's applications first. Accordingly, it created a sub-docket, No. 4:31-cv-00061-SRB, to which it transferred Freeport's fifty-nine applications, while staying the proceedings on other parties' applications. At the district court's invitation, the parties

---

[2] Although under the UVFA the United States and Community had agreed not to object to properly filed applications, the Community contended that the applications at issue did not conform to the Change in Use Rule, making its objections appropriate, and the district court accepted this assertion.

selected ten of Freeport's applications for initial adjudication.[3]

In its applications, Freeport described its parcels by reference to the quarter-quarter section in which they fell but did not indicate a more specific location for the lands to and from which it was seeking to sever and to transfer water rights. After a ruling by the district court that sever and transfer applications should identify the "precise locations of the parcels within the quarter-quarter section," Freeport hired a consultant to create more detailed maps and legal descriptions of the lands at issue. Freeport disclosed these revised maps and descriptions during discovery in November 2009. The revisions affected the locations and legal descriptions of multiple parcels, though each map revision fell within the same overall quarter-quarter section as its original application.

D

The district court held an evidentiary hearing (which the parties refer to as a "trial") on Freeport's initial ten applications from February 9–25, 2010 and denied them all on August 3, 2010, granting the Tribe's motion for judgment as a matter of law. The court concluded that (1) Freeport had failed to present a prima facie case of no injury to other Decree parties, (2) Arizona's statutory forfeiture law did not apply, and (3) Freeport had partially abandoned the water rights in one of its proposed sever parcels, and (4) it further declined to amend Freeport's applications to conform to its revised maps.

---

[3] Applications 2008-115, -118, -122, -133, -138, -147, -150, -151, -162 and -166.

Freeport attempted to appeal the order, but we declined jurisdiction because it was "neither a partial nor a final judgment." *United States v. Sunset Ditch Co.*, 472 F. App'x 472, 474 (9th Cir. 2012). We instructed the district court that it needed to "resolve issues related to Freeport's other applications, as well as issues related to other applicants." *Id.* at 473.

Thereafter, the district court proceeded to adjudicate other sever and transfer applications filed in 2008. Freeport's remaining applications were either denied or withdrawn. Pursuant to the UVFA, Freeport entered into covenants agreeing "to retire certain decreed water rights and to refrain from irrigating" the lands that were the subject of six of the original ten applications first adjudicated by the district court.[4] All of the remaining 2008 applications from non-Freeport parties were eventually withdrawn.

E

On September 4, 2014, the district court entered "final judgment with respect to, and in accordance with, all the Court's orders and proceedings on the 419 applications to sever and transfer Decree water rights filed with the Water Commissioner in 2008," applicable both to the main docket, No. 4:31-cv-00059-SRB, as well as the separate Freeport sub-docket, No. 4:31-cv-00061-SRB. Nonetheless, there have been new sever and transfer applications filed on the main docket since 2008, and the district court continues to

---

[4] These applications are 2008-115, -118, -122, -133, -151, and -166.

adjudicate issues on such docket (but not the Freeport docket).[5]

The United States, the Community, and the Tribe timely appealed, and Freeport, Gila Valley Irrigation District, Franklin Irrigation District, Larry W. Barney, Viri Viva Lunt Revocable Trust, TRP Family Trust., Ronald Howard, Janice Howard, Myrna Curtis, Joe B. Tatum, Judy L. Tatum, Harrington Ranch And Farm, S&R Daley, LP, and Steve Daley, Ross and Fawn Bryce Family Trust, Householder Family Limited Partnership, and Kenneth Claridge timely cross-appealed.

## II

Before reaching the merits, various jurisdictional questions have been brought to our attention by the parties, which must first be resolved. "We, of course, have jurisdiction to determine our own jurisdiction." *Special Invs., Inc. v. Aero Air, Inc.*, 360 F.3d 989, 992 (9th Cir. 2004).

## A

As the parties explain, the sever and transfer applications of all of the non-Freeport applicants that were filed in 2008 have been voluntarily withdrawn or dismissed without prejudice, together with their accompanying objections.

---

[5] We **GRANT** the motion of Gila Valley Irrigation District et al. filed on February 9, 2017 to take judicial notice of the sever and transfer applications filed with the Water Commissioner in 2014 by Ronald G. and Janice A. Howard and S&R Daley LP, together with the accompanying declaration of Herbert Dishlip. These applications are still pending on the main docket.

"Article III's 'case-or-controversy' requirement precludes federal courts from deciding 'questions that cannot affect the rights of litigants in the case before them.'" *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 834 (9th Cir. 2014) (quoting *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (per curiam)). Indeed, "the general rule in this circuit" is that "voluntary dismissals without prejudice do not create appealable, final judgments." *Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738, 748 (9th Cir. 2008); *see also Concha v. London*, 62 F.3d 1493, 1507 (9th Cir. 1995). *But see James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1070 (9th Cir. 2002) (carving out a limited exception to this rule).

Because the applications and accompanying objections filed by non-Freeport defendants have been voluntarily withdrawn or dismissed without prejudice, any decision of this court will affect the rights of these parties only tangentially by outlining legal principles which could apply to future applications. Thus, as counsel for the non-Freeport defendants admitted at oral argument, this court lacks jurisdiction over the applications and associated objections of non-Freeport applicants.

B

1

There is a further reason to decline jurisdiction over the appeals of non-Freeport defendants, as they also recognize. "A district court order is . . . not appealable unless it disposes of all claims as to all parties or unless judgment is entered in compliance with Federal Rule of Civil Procedure 54(b)." *Romoland Sch. Dist.*, 548 F.3d at 747. Federal Rule of Civil Procedure 54(b) provides:

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, *the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.* Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

(emphasis added).

Thus, as Rule 54(b) makes plain, "[f]inality is achieved only if the court takes each of two steps—it must make an 'express determination that there is no just reason for delay' and it also must make 'an express direction for the entry of judgment.'" 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction and Related Matters* § 3914.7 (2d ed. 1991).

Here the district stated that it was entering "final judgment with respect to . . . the 419 applications . . . filed . . . in 2008." But it never made an "express determination" that there was no need for further delay. One might argue that the district court's order of "final judgment" necessarily means that the district court thought there was no reason to delay appeal. Yet, "[i]nterpreting a judgment as a Rule 54(b) determination without the required findings would

effectively read out those requirements from Rule 54(b)." *Am. States Ins. Co. v. Dastar Corp.*, 318 F.3d 881, 889 (9th Cir. 2003).

The United States and Community contend that we have jurisdiction "over any order that finally resolves all matters in a post-judgment proceeding." Indeed, "*[t]he Supreme Court has emphasized that the finality* requirement is to be given 'a "practical rather than a technical construction."'" *United States v. Ray*, 375 F.3d 980, 985 (9th Cir. 2004) (quoting *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 375 (1981)). Further, "when post-judgment orders are involved[,] [t]he policy against and the probability of piecemeal review [one of the major justifications for the final order doctrine] is not as decisive a consideration after judgment as before judgment since the underlying dispute is already settled." *Id.* at 986 (first and second alteration in original) (quoting *United States v. Washington*, 761 F.2d 1404, 1406 (9th Cir. 1985)); *see also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1064–65 (9th Cir. 2010).

Yet, such cases addressed whether post-judgment orders *could be* final for purposes of 28 U.S.C. § 1291, rather than discussing the procedural requirements needed *to make* an order final under Rule 54(b). There is no question that a post-judgment order can be treated as a final order, even if there remain other, ongoing post-judgment proceedings. *See Ray*, 375 F.3d at 986. But this does not free the district court from the strictures of Rule 54(b).

It is true that in the context of post-judgment proceedings in *Washington*, 761 F.2d at 1406–07, we held that a district court's decision to adopt a five-year "interim" plan, governing the number of fish permitted to escape certain fisheries, was appealable as a final order, although the district court did not certify it under Rule 54(b) or as an

interlocutory appeal under 28 U.S.C. § 1292(b). But we never evaluated the application of Rule 54(b) in that case. Thus, *Washington* explains why, in the context of district court's ongoing jurisdiction over a consent decree, it may be sensible to treat certain orders resolving discrete issues as "final," but it does not explain why such orders should be exempt from Rule 54(b).

Indeed, a Rule 54(b) explanation is especially helpful where (as here) there are multiple parties litigating multiple claims at differing stages, leading to the possibility of confusion and overlap. It is undisputed that there are ongoing sever and transfer applications being litigated on the main docket (No. 4:31-cv-00059-SRB), which were filed in 2014. While resolution of these applications need not affect the disposition of the 419 applications from 2008, if the district court wanted to evaluate sever and transfer applications in discrete chronological chunks, it should have followed Rule 54(b), which governs a district court's authority to enter final judgment for *some* (rather than *all*) claims or parties.

Because the district court failed to find that there was no need for further delay, its September 4, 2014 order was not properly appealable, as it relates to the main docket, No. 4:31-cv-00059-SRB.

2

Unlike the main docket, however, the Freeport sub-docket, 4:31-cv-00061-SRB, has no additional applications that remain pending. Indeed, the September 4, 2014 order conclusively resolved the claims of all parties on the Freeport docket. Thus, no Rule 54(b) finding was required for appeals from this docket, and jurisdiction over Freeport's applications and the accompanying objections is proper.

## C

Nonetheless, there are further jurisdictional questions surrounding the appeals from the Freeport docket.

### 1

Of the ten applications originally decided by the court in August 2010, Freeport contends that six of them[6] have become moot because it entered into covenants not to exercise its water rights in the lands covered by these applications pursuant to the UVFA. Freeport further neglected to appeal a seventh application that was the subject of the district court's August 2010 order, Application 2008-147. Nevertheless, Freeport now argues that we have jurisdiction to review the district court's finding of abandonment in the transfer parcel that was the subject of Application 147.

Notwithstanding the covenants, the Community, Tribe, and United States maintain that their objections to all ten of the applications decided by the district court in August 2010 remain pending. They observe that the district court chose to treat their objections as counterclaims and ruled that objections would remain pending even if the target application was withdrawn.[7] With respect to the six

---

[6] Applications 2008-115, -118, -122, -133, -151, -166.

[7] The district court has broad discretion to enforce the Decree (under its terms) and set the rules for how to adjudicate disputes in these post-judgment proceedings. Nevertheless, while the district court was well within its authority to construe the objections as counterclaims, the constitutional floor of a case or controversy remains. *See Timbisha Shoshone Tribe v. U.S. Dep't of Interior*, 824 F.3d 807, 813–14 (9th Cir. 2016). Therefore, as the district court appears to have recognized, once

applications that Freeport maintains are moot, the Plaintiffs argue that if the water rights covered by these applications had already been forfeited or abandoned prior to Freeport's decision to enter into the covenants, these lands could not have counted toward the reduction of irrigable acres that was required by the UVFA. Thus, they contend that adjudication of these six counterclaims will continue to have real-world consequences for the parties, because a finding of forfeiture would require the UVDs to identify additional acres not to water in order to comply with the UVFA.

However, Plaintiffs made such point in a footnote in their supplemental brief on jurisdiction, which was filed at our request. The Plaintiffs do not provide sufficient background on the UVFA, and the covenants made pursuant to it, to enable us to decide whether this interpretation of the UVFA is correct. Moreover, Freeport has not had an opportunity to respond to this claim.

---

the underlying application is withdrawn, objections need to have independent viability, rather than being based on procedural issues with the application, to have continued force. In other words, such objections must be proper counterclaims—such as a claim that Freeport has forfeited or abandoned its water rights—rather than defenses to the application—such as a claim that an application failed to present a prima facie case of no injury or failed to specify with sufficient particularity the property at issue. *Cf. Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 93–94 (1993) ("An unnecessary ruling on an affirmative defense is not the same as the necessary resolution of a counterclaim for a declaratory judgment."). Thus, where Freeport's underlying applications have been withdrawn, we hold that only objections of forfeiture or abandonment remain pending.

2

As a general rule, we will not consider arguments that are raised for the first time on appeal." *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). Both Freeport's claim of mootness and the Plaintiffs' response arose after the district court's August 2010 order. Because it was not presented to the district court, we decline to address the issue in the first instance.

There is no dispute that we have jurisdiction over the three applications (and accompanying counterclaims) that were covered by the district court's August 2010 order and have not been impacted by restrictive covenants.[8]

Further, we agree with Freeport that we have jurisdiction to review the district court's finding of abandonment with respect to the land that was at issue in Application 147. Although Freeport did not appeal denial of Application 147, it is possible for the issue to have independent viability apart from the application because the district court treated Plaintiffs' objections of abandonment as counterclaims.[9] *Cf.* Fed. R. Civ. P. 41(a)(2). Freeport vigorously contested the finding of abandonment in its opening brief. Thus, we are satisfied that Freeport has properly raised the issue on appeal, notwithstanding its failure to appeal the denial of Application 147 itself.

---

[8] Applications 2008-138, -150, and -162.

[9] Indeed, the district court issued a separate judgment regarding its finding of abandonment for a portion of the land that was the subject of Application 147, apart from its rejection of Freeport's applications.

3

Finally, there are Freeport's remaining applications. Prior to the district court's August 2010 order, Freeport withdrew seven of its original fifty-nine applications. After the district court's August 2010 order denied ten of Freeport's applications, Freeport voluntarily withdrew another twenty-two applications, and the district court denied the last twenty applications pursuant to the rulings in its August 2010 order. Freeport appeals from the denial of fourteen of these twenty applications.[10] Although we lack jurisdiction over the applications (and objections) that were voluntarily withdrawn, *Romoland Sch. Dist.*, 548 F.3d at 748, because the non-withdrawn fourteen applications were denied by the district court, jurisdiction is proper as to them.

4

Thus, we are satisfied that jurisdiction is proper over Applications 138, 150, and 162, together with their associated counterclaims, along with the counterclaim for Application 147, and the additional fourteen applications appealed by Freeport. Because these applications present the forfeiture, abandonment,[11] prima facie case, and procedural issues raised by the parties, there are no jurisdictional bars to our review of these issues. We leave it to the district court to decide in the first instance whether the other six applications and associated counterclaims have become moot due to the covenants Freeport has entered under the UVFA.

---

[10] Applications 2008-114, -117, -121, -126, -131, -132, -134, -135, -146, -148, -149, -153, -155, and -156.

[11] In part. *See infra* Part III.E.

### III

Turning to the merits, Freeport contends that the district court erred by granting judgment as a matter of law to Plaintiffs.[12]

### A

Freeport first disputes the district court's holding that it failed to present a prima facie case of no injury to other Decree parties.

Article XI of the Decree provides that "any of the parties to whom rights to water have been decreed herein shall be entitled, in accord with applicable laws and legal principles, to change the point of diversion . . . *so far as they may do so without injury to the rights of other parties*." (emphasis added). Following this mandate, the Change in Use Rule, issued by the district court, states: "[t]he applicant shall have the burden of establishing a prima facie case of no injury to the rights of other parties under the Gila Decree and a right to transfer." Once such prima facie case has been made, "the burden of proof . . . shift[s] from the applicant to the objecting party to demonstrate that injury will result from the proposed change."

In its applications, Freeport provided the following paragraph in an attempt to fulfill its prima facie burden:

> All that will be changed as a result of this application will be the location of decreed

---

[12] "In reviewing a judgment following a bench trial, this court reviews the district court's findings of fact for clear error and its legal conclusions de novo." *Dubner v. City & Cty. of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001).

rights and associated point of diversion under the Globe Equity No. 59 Decree. The priorities, volumes of water use and acreage will not change. There will be no net increase or decrease in decreed rights as a result of this proposed severance and transfer.

Freeport relied on this statement at trial and thus did not present any evidence regarding the absence of injury as part of its case in chief, although it did offer expert testimony on rebuttal.

The district court found that by making such generalized assertions, Freeport failed to fulfill its prima facie burden. Indeed, accepting such assertions would render the prima facie burden a nullity, since under the Decree a party may transfer no more water than it has a right to use, and priorities will remain unchanged after transfer. Instead, the district court held that Freeport needed to address issues of water quantity (with particular attention to a section of the river known as Cosper's Crossing) and quality diminution, as well as the cumulative impact of its proposed sever and transfer applications.

We discuss each in turn. At the outset, we agree with the district court that in order to make a prima facie case of no injury, parties must do more than recite that the quantity of water being diverted and the order of priorities remain the same. Merely recapitulating the protections of the Decree does not demonstrate that there will be no "injury to the rights of other parties," as the Decree requires.

"It is axiomatic in water law that the appropriator, be he junior or be he senior, always has the burden of establishing that a change in his diversion or in his use of water has not affected the rights of other appropriators . . . ." *Zannaras v.*

*Bagdad Copper Corp.*, 260 F.2d 575, 577 (9th Cir. 1958). Possible injury should be "analyzed by comparing the impact of a proposed change against a baseline of existing conditions." *United States v. Orr Water Ditch Co.*, 309 F. Supp. 2d 1245, 1253 (D. Nev. 2004), *aff'd sub nom. United States v. Truckee-Carson Irrigation Dist.*, 429 F.3d 902 (9th Cir. 2005).

1

The Gila River has a unique feature known as "Cosper's Crossing," a portion of the river that frequently runs dry above ground. Under a previous arrangement, when Cosper's Crossing is dry, upstream water-users are permitted to divert the entire flow of the river before it reaches Cosper's Crossing, in disregard of senior rights downstream. *See United States v. Gila Valley Irrigation Dist.*, 920 F. Supp. 1444, 1462–66 (D. Ariz. 1996), *aff'd*, 117 F.3d 425 (9th Cir. 1997) (Mem.).

At least one of Freeport's pending applications involved a request to transfer water rights downstream from Cosper's Crossing to a location above Cosper's Crossing.[13] It seems likely that such a change could affect Cosper's Crossing, as the district court found. If these transfers caused Cosper's Crossing to run dry earlier, then the preexisting arrangement allowing upstream users to divert the entire flow of the river would be triggered, exacerbating the injury to the rights of downstream owners like the Tribe.

Freeport contends that if such situation occurs, the Tribe can issue a call which requires all diversions above Cosper's Crossing to cease. Indeed, Freeport makes a similar

---

[13] Application 162.

argument regarding any potential injury that results from transferring the location of its water rights—the Tribe, as senior appropriator, can make a call that requires the Upper Valley rights holders to cease diverting water. While Freeport is correct, such remedy operates only *after* a violation of the Tribe's rights has already occurred. It does not prevent injury—the very thing that the Decree states must be avoided.

Indeed, there is a delay between the time upstream diversions cease and the time the Tribe actually receives water. Such delays are inimical to the Tribe's ability to grow crops, which will die if they do not receive water at the appropriate time. According to testimony from the Water Commissioner, there is already insufficient water to meet the Tribe's demands.  Anything that exacerbates these shortages could detrimentally impact the Tribe's rights.

2

More generally, changing the location of diversions has the potential to affect the return flow of water into the river. As the district court explained:

> For example, if the distance from the proposed diversion point to the proposed place of use is much greater than the distance from the existing diversion point to the existing place of use, then more water will be lost by evaporation in transport, thereby decreasing the return flow from the proposed water use. If the soil at the proposed place of use causes greater consumptive use of water, or the proposed ditch is less water efficient than the existing ditch, then the return flow also decreases. Likewise, if a portion of the

> proposed ditch flows outside the Gila
> subflow zone, then a portion of the return
> flow does not end up in the Gila River for use
> by other Decree water right holders.

While any impact from a particular transfer might be minimal, this is for the applicant to demonstrate. Freeport failed to address any of the preceding concerns in its case in chief.

### 3

Changing the type of diversion can also impact water quality. At least one of Freeport's remaining applications (Application 162) proposed changing a ground level diversion to a pumping diversion (i.e. a well). Groundwater pumped from a well is higher in salinity than surface flow; thus, over time, pumping increases the level of salt in the Gila River, which in turn negatively affects the Tribe, who has already struggled with salty water that is unsuitable for growing crops (hence the Water Quality Injunction). *See Gila Valley Irrigation Dist.*, 920 F. Supp. at 1449–51.

Freeport again argues that the Tribe can rely on the Water Quality Injunction to stop such diversions if salinity levels become too high, but, as discussed, such remedy operates only if there has been an initial infringement of the Tribe's rights.  Thus, the Injunction does not prevent injury to the rights of other parties.

### 4

Freeport further argues that the district court erred by requiring it to assess the cumulative impact of its sever and transfer applications. Because each application is filed

individually, Freeport argues that they should be individually analyzed.

Nonetheless, "[i]n an equitable proceeding such as this, all . . . evidence is relevant to making an informed decision." *GVID IV*, 31 F.3d at 1433. There is no question that multiple sever and transfer applications may cause significant impacts upon the River, which would not result from a single application. Since each party to the Decree is enjoined from "in any manner . . . prevent[ing] or interfer[ing] with the diversion, use or enjoyment of [the] waters by the owners of prior or superior rights," when a single party presents multiple sever and transfer applications concurrently, it is sensible to analyze their cumulative effect.[14]

5

In sum, there are multiple issues of injury that Freeport could have addressed, including the impact of its proposed transfers on Cosper's Crossing and the return flow and salinity levels of the Gila River, both individually and cumulatively. Instead, Freeport presented absolutely no evidence in its case in chief regarding the impact of its proposed transfers upon the rights of other parties to the Decree. Given Freeport's utter failure to meet its prima facie burden, the district court did not err in rejecting Freeport's applications on this basis.

B

Freeport further contends that the district court erred by denying its motion under Federal Rule of Civil Procedure

---

[14] The same logic may not apply, however, when *different* parties present sever and transfer applications in the same time period.

15(b)(1) to amend its applications to conform to the revised maps it filed during discovery.

Rule 15(b)(1) provides:

> If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits.

Fed. R. Civ. P. 15(b)(1). We review a district court's Rule 15(b) decisions for abuse of discretion.[15] *Madeja v. Olympic Packers, LLC*, 310 F.3d 628, 635 (9th Cir. 2002).

1

There is a significant dispute with respect to whether Freeport ever asked the district court to amend its applications to conform to the revised legal descriptions presented by the new maps. At the hearing, the district court

---

[15] The government argues that Rule 15 does not apply because these are post-judgment proceedings and the sever and transfer applications are not, strictly speaking, pleadings. We agree with the government that the district court has broad discretion to set the rules for adjudicating sever and transfer applications. *See supra* note 7. Nevertheless, because the district court ruled that the Federal Rules of Civil Procedure would apply to these proceedings, and appears to have considered the possibility of amendment under Rule 15, we evaluate the issue under the Rule 15 framework.

specifically asked Freeport about the significance of the revised legal descriptions.[16] During closing argument, Freeport informed the court that its answer was "it depends." When the district court noted that Freeport had not requested a Rule 15 amendment, Freeport's counsel stated "We're not going to ask." Nevertheless, Freeport informed the court that if it found the original descriptions insufficient, then Freeport's "alternative" would be to "go with the revised legal descriptions[,] and that's what [it] would request." Thus, rather than taking a firm position, Freeport attempted to play both sides of the issue, which essentially amounted to a request for the district court to rely on whichever maps it preferred.[17]

It is true that "Federal Rule of Civil Procedure 15(b) embodies a liberal policy in favor of allowing pleading amendments at any time during and even after trial." *Consol. Data Terminals v. Applied Digital Data Sys., Inc.*, 708 F.2d 385, 396 (9th Cir. 1983). Indeed, under Rule 15, "leave to amend 'should be granted unless amendment would cause prejudice to the opposing party, is sought in bad faith, is futile, or creates undue delay.'" *Madeja*, 310 F.3d at 636 (quoting *Yakama Indian Nation v. Wash. Dep't of Revenue*, 176 F.3d 1241, 1246 (9th Cir. 1999)).

---

[16] Prior to the hearing, Freeport had taken an ambiguous position, contending that its original legal descriptions were sufficient, while offering the revised descriptions in an attempt to resolve objections. Notably, Freeport does not argue that it moved to amend its applications when it submitted the revised maps before the hearing.

[17] Indeed, the district court appears to have concluded that Freeport never made a request for amendment. In its order, the district court observed that "Freeport never filed the changes as application amendments with the . . . Court."

Thus, in the context of Rule 15(b)(2), we have found that in the absence of a formal request for amendment, "a district court may amend the pleadings merely by entering findings on the unpleaded issues." *Galindo v. Stoody Co.*, 793 F.2d 1502, 1513 n.8 (9th Cir. 1986). But Rule 15(b)(2) states that an issue "*must* be treated . . . as if raised in the pleadings" when it "is tried by the parties' express or implied consent." Fed R. Civ. P. 15(b)(2) (emphasis added).

Freeport is not arguing that the parties impliedly consented to amendment of its applications under Rule 15(b)(2), however. Instead, its claim is based on Rule 15(b)(1), which states that a "court *may* permit the pleadings to be amended" if "a party objects that evidence is not within the issues raised in the pleadings." Fed. R. Civ. P. 15(b)(1) (emphasis added). Thus, under Rule 15(b)(1), the district court certainly was not *required* to amend Freeport's sever and transfer applications in the absence of a formal request, and even if Freeport made such a request, the district court had discretion to deny it.

2

Regardless of whether Freeport properly moved for amendment, the district court evaluated the issue. It determined that the revised legal descriptions were "material changes" to Freeport's applications, and that "material change[s]" could not be made after sever and transfer applications have been published by the Water Commissioner for other Decree parties to review. Freeport contends that the district court's ruling on material changes is inconsistent with Rule 15(b)(1).

The district court was correct that the changes made by the revised maps were significant. In some applications Freeport wholly replaced the description of one parcel of

land with that of another. In other instances, the revised descriptions changed the number of acres involved or the shape of the parcel at issue. Such amendments raise issues of notice.

Freeport contends that such notice concerns are overblown. Parties to the litigation had notice once Freeport submitted its revised maps as part of discovery. Yet, even though they were aware of the revised descriptions, given Freeport's failure to move to amend its applications prior to the hearing, and its (at best) half-hearted attempt to request an amendment during closing argument, the objecting parties could not be certain which legal descriptions (and corresponding parcels) they needed to address. Knowing the precise location of the sever and transfer parcels was crucial to the parties' ability to evaluate the impact of the proposed transfers.

Apart from the parties to this suit, the district court also observed that the revised descriptions created notice problems for other landowners covered by the Decree. Freeport argues that any concerns with notice for other Decree parties not participating in this litigation are irrelevant. According to Freeport, if it had submitted new sever and transfer applications, the descriptions of the land that would have been published by the Water Commissioner would have listed the very same quarter-quarter sections as its original applications, because the changes still involved land located in the same quarter-quarter section. In other words, the notices would be identical.

Nevertheless, as the Community observes, any Decree party may request a mailed copy of the entire application, which would have included the revised maps. Presumably, any interested parties would make such request and then use the application to evaluate whether to file an objection. Thus,

contrary to Freeport's claim, amending sever and transfer applications at the eleventh hour would have prejudiced other Decree parties, who might have chosen to object.

Because allowing Freeport to amend its applications during closing argument *would have* resulted in prejudice to the objecting parties in this suit and *may have* resulted in prejudice to additional parties under the Decree, as in *Madeja*, 310 F.3d at 636, we conclude that the district court did not abuse its discretion in rejecting any attempt by Freeport to amend its applications. Where, as here, "material changes" will prejudice parties by lack of notice, we agree with the district court that such changes should be made by filing new sever and transfer applications.

## C

Finally, we turn to the question of whether Arizona's law of statutory forfeiture applies to Freeport's water rights.[18]

### 1

Under Arizona Revised Statutes § 45-141(C):

> Except as otherwise provided in this title or in title 48, when the owner of a right to the use of water ceases or fails to use the water appropriated for five successive years, the right to the use shall cease, and the water shall revert to the public and shall again be subject to appropriation. This subsection or any other

---

[18] Apart from the dismissal of Freeport's applications, the remaining objections to Applications 138, 150, and 162 (for which there are no mootness concerns) present the forfeiture issue.

> statutory forfeiture by nonuse shall not apply
> to a water right initiated before June 12, 1919.

This section was amended in 1995 to include the last sentence prohibiting the application of forfeiture to water rights which vested before 1919. *See San Carlos Apache Tribe v. Superior Court ex rel. Cty. of Maricopa*, 972 P.2d 179, 187, 204 (Ariz. 1999) (en banc); 1995 Ariz. Sess. Laws 18. In *San Carlos Apache Tribe*, the Arizona Supreme Court held that the last sentence violated the due process clause of the Arizona Constitution by retroactively altering vested rights, which may have already been forfeited to others. 972 P.2d at 189–90, 201. The Arizona Supreme Court concluded that "[f]orfeiture and resultant changes in priority must be determined under the law as it existed at the time of the event alleged to have caused the forfeiture." *Id.* at 190.

The district court decided to conduct an independent analysis to determine whether Arizona's 1919 water code permitted the application of statutory forfeiture (which was created by the code) to water rights which vested before the passage of the code in 1919. In other words, the district court asked whether Arizona's water law provided an alternative source for the rule contained in the offending clause of § 45-141(C).

Based on a savings clause in the 1919 code, and Nevada cases interpreting a similar clause in Nevada's water code of 1913, the district court concluded that water rights which vested prior to 1919 could not be lost through statutory forfeiture. *See* Laws of Ariz., Ch. 164, § 1 (1919); *United States v. Orr Water Ditch Co.*, 256 F.3d 935, 941–43 (9th Cir. 2001); *In re Manse Spring & Its Tributaries*, 108 P.2d 311, 315–16 (Nev. 1940). Thus, the district court held that

Arizona water law contained an almost identical rule prior to the 1995 amendment.

2

Such interpretation was foreclosed, however, by the Arizona Supreme Court's holding in *San Carlos Apache Tribe*. By finding § 45-141(C) unconstitutionally retroactive, the Arizona Supreme Court necessarily held that the 1995 amendment constituted a change in the law. *See San Carlos Apache Tribe*, 972 P.2d at 189–90.

Indeed, the Arizona Supreme Court repeatedly emphasized that retroactive statutes are problematic because they *change the law* that applied to past events. Thus, the Arizona Supreme Court explained that "[a] statute may not . . . 'attach[] new legal consequences to events completed before its enactment.'" *Id.* at 189 (second alteration in original) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994)). It further observed that "legislation may not disturb vested substantive rights by retroactively changing the law that applies to completed events." *Id.* Again, the court reiterated that "[t]he Legislature may not . . . change the legal consequence of events completed before the statute's enactment." *Id.* Therefore, "the Legislature cannot revive rights that have been lost or terminated under the law as it existed at the time of an event and that have vested in otherwise junior appropriators." *Id.*

When evaluating § 45-141(C) specifically, the Arizona Supreme Court held that the statute "create[d] a *new* and unconstitutional protection for pre-1919 water rights that may have been forfeited and vested in others under the law existing prior to 1995." *Id.* at 190 (emphasis added). In order for this "new" provision to be unconstitutionally retroactive, it must have changed the law. And if the 1995 amendment

to § 45-141(C) changed the law, prior to this point, water rights which vested before 1919 were subject to statutory forfeiture.

Thus, the district court erred. There was no need to evaluate further the 1919 water code. The Arizona Supreme Court is the final arbiter of Arizona law, and it had already found that statutory forfeiture applies to pre-1919 water rights.[19]

Without the offending amendment,[20] § 45-141(C) provides that when the owner of a water right fails to use the

---

[19] Note that even if the Arizona Supreme Court had not decided this question, there would still be good reason to reject the district court's interpretation of the 1919 water code. The savings clause upon which it relied was deleted from later versions of the code, and forfeiture "must be determined under the law as it existed at the time of the event alleged to have caused the forfeiture." *San Carlos Apache Tribe*, 972 P.2d at 190. The extent to which the savings clause might survive in other portions of the code is contested.

Further, the 1919 savings clause may be best read as a prohibition against the retrospective application of statutory forfeiture. It provided that "nothing herein contained shall be so construed as to take away or impair the vested rights which any person, firm, corporation or association *may have . . . at the time of passage* of this act." Laws of Ariz., Ch. 164, § 1 (1919) (emphasis added). Under such interpretation, the forfeiture provision would not apply to a person who failed to use his water right for five consecutive years preceding the enactment of the code (i.e. before 1919), but could apply to someone who failed to use his water rights for five years following enactment of the code (i.e. 1919 onward).

[20] We assume that the statutory forfeiture provided for in § 45-141(C) remains in force without the last sentence prohibiting its application to water rights which vested before 1919. The Arizona Supreme Court held that § 45-141(C) was unconstitutional insofar as it "eliminate[ed] any possibility of forfeiture for rights initiated before June

right for five years, he loses that right. Because the district court rejected statutory forfeiture, it did not consider how forfeiture would affect the water rights at issue, and the parties have provided little guidance on appeal. Therefore, we leave it to the district court on remand to determine in the first instance how statutory forfeiture applies to the remaining objections.[21]

## D

Freeport also argues that the district court erred by finding that it had abandoned its water rights in 1.4 acres of land covered by a road and a canal that was at issue in Application 147.

## 1

Under Arizona law, "[a]ny person who is entitled to divert or withdraw public waters of the state . . . who intentionally abandons its use relinquishes that right." Ariz.

---

12, 1919." *San Carlos Apache Tribe*, 972 P.2d at 201. Although the Arizona Supreme Court did not explicitly address the severability of this provision from the larger section, "[a]n entire statute need not be declared unconstitutional if constitutional portions can be separated." *Republic Inv. Fund I v. Town of Surprise*, 800 P.2d 1251, 1259 (Ariz. 1990) (en banc). "The test for severability . . . [is] legislative intent." *Id.* Since prior to 1995, subsection § 45-141(C) did not contain the offending last sentence, we conclude that legislature intended this sentence to be severable.

[21] Because the remaining sever and transfer applications can be dismissed on other grounds, there is no need to evaluate the application of statutory forfeiture as to them.

Rev. Stat. Ann. § 45-188(B).[22] Thus, "[a] water right is deemed abandoned if the holder intends to abandon the right and a period of non-use occurs." *Phelps Dodge Corp. v. Ariz. Dep't of Water Res.*, 118 P.3d 1110, 1115 (Ariz. Ct. App. 2005) (citing *Gould v. Maricopa Canal Co.*, 76 P. 598, 601 (Ariz. Terr. 1904)). "[I]ntent may be manifested or inferred from [an] act," *City of Tucson v. Koerber*, 313 P.2d 411, 418 (Ariz. 1957).

Whether a party has abandoned a water right "depends upon the facts and circumstances surrounding each particular case." *Landers v. Joerger*, 140 P. 209, 210 (Ariz. 1914) (internal quotation marks omitted). Therefore, because "it is a question of fact," *id.*, we review a district court's finding of abandonment for clear error, Fed. R. Civ. P. 52(a)(6).

2

Here the district court found that a "prolonged period of non-use," coupled with improvements to the property that were "incompatible with irrigation" (the construction of the road and canal), as well as Freeport's failure to attempt to transfer the water rights prior to 2008, provided sufficient evidence that Freeport intended to abandon its water rights.

---

[22] *See also* Ariz. Rev. Stat. Ann. § 45-188(A). Section 45-188(B) covers water rights that vested before June 12, 1919, and § 45-188(A) covers water rights that vested after June 12, 1919. Section 45-188 was held to be unconstitutional in part by *San Carlos Apache Tribe*, 972 P.2d at 191, 202, because the 1995 amendments to § 45-188 changed the law to prohibit forfeiture from applying to water rights which vested before 1919. However, we again presume that the Arizona legislature intended for unconstitutional aspects of this section to be severed. *See Republic Inv. Fund I*, 800 P.2d at 1259. It is easy to separate abandonment, which applies both to pre- and post-1919 water rights from the unconstitutional restriction of forfeiture to water rights which vested after 1919.

Thus, the district court held that the 1.4 acres covered by a road and canal, which were part of a larger 15.5 acre sever parcel in Application 147, had been abandoned.

Freeport points to evidence that it contends undermines the district court's finding of intent to abandon: (1) it bought the farmlands for the purpose of acquiring water rights; (2) it required each lessee to maintain its water rights; (3) it maintained all of its ditches and canals and paid taxes and fees related to the water rights; and (4) it has engaged in negotiations and litigation to resolve disputes about water rights in the community (including the Pumping Complaint and the UVFA).

3

We address each point in turn. First, buying lands with the purpose of acquiring water rights is irrelevant if one does not act to retain these rights after purchase (by removing developments which are inconsistent with water usage), or if the water rights have already been abandoned prior to purchase.

Similarly, requiring lessees to maintain water rights *in general* has little probative value if no one actually addressed the issue of water rights appurtenant to the 1.4 acres of land covered by the road and canal. Freeport presents no evidence that it (or its tenant) tried to remove these improvements.

On the other hand, there is little doubt that maintaining ditches and canals and paying taxes and fees certainly cuts against an intent to abandon. Nonetheless, such actions are not necessarily dispositive.

As the district court observed, under Nevada law, "[w]here there is evidence of both a substantial period of nonuse, combined with evidence of an improvement which is inconsistent with irrigation, the payment of taxes or assessments, alone, will not defeat a claim of abandonment." *Orr Water Ditch Co.*, 256 F.3d at 946 (quoting *United States v. Alpine Land & Reservoir Co.*, 27 F. Supp. 2d 1230, 1245 (D. Nev. 1998)). Unfortunately, there are few cases evaluating abandonment under Arizona law. Nevertheless, while "nearly all western states presume an intent to abandon upon a showing of a prolonged period of non-use," Nevada permits only an "inference" that "a prolonged period of non-use" may indicate abandonment. *Id.* at 945. Thus, if Nevada has one of the most stringent tests for abandonment and holds that payment of fees does not negate an abandonment claim, it seems likely that Arizona law would reach a similar conclusion.[23]

In this case, the 1.4 acres that the district court found abandoned were only a portion of the entire 15.5 acre parcel at issue in Application 147. It appears that water taxes and fees are assessed against an entire parcel. Thus, the payment of taxes and fees does not necessarily indicate a *lack* of intent to abandon the water rights in the land covered by the road and canal; if Freeport wanted to retain its water rights in the rest of the parcel, it would have had to pay these fees.

---

[23] We need not decide whether Arizona permits a presumption of abandonment upon a showing of nonuse like many western states or whether it follows Nevada's approach that a showing of nonuse creates only an inference of abandonment. *See Orr Water Ditch Co.*, 256 F.3d at 945. Under either approach, because the road and canal presented significant evidence of intent to abandon, *see infra* p. 42, we conclude that the district court did not err.

Finally, engaging in litigation related to one's water rights certainly undermines a finding of intent to abandon as *Gila Water Co. v. Green*, 232 P. 1016, 1019 (Ariz. 1925), *vacated on reh'g*, 241 P. 307 (Ariz. 1925), illustrates. [24] In that case, the Arizona Supreme Court observed that left "unexplained," a twenty-five year period of nonuse between when a dam washed out and a new one was built "would be very strong evidence of an intention to abandon." *Id.* Nonetheless, the court held that there was a valid explanation for the delay—litigation over the rights under the title. *Id.*

Thus, Freeport is correct that its involvement in negotiations and litigation over the water rights on the Gila River could undermine a finding of intent to abandon. However, as the district court noted, Freeport holds a significant amount of property covered by the Decree, and the litigation it references—the Pumping Complaint and UVFA—involved issues of widespread concern to many property owners. Unlike *Green*, which involved litigation over a specific title, 232 P. at 1019, the litigation Freeport is referencing does not involve the specific question of whether Freeport held water rights to the sever parcel at issue in Application 147, or more particularly, whether its water rights included the land covered by a road and a canal. Thus, Freeport's involvement in prior negotiations and litigation says little about its intent to abandon the water rights in the 1.4 acres covered by the road and canal.

---

[24] While the Arizona Supreme Court vacated *Green* on rehearing, it did so because it had declined to apply the doctrine of forfeiture in the first instance, not because of any legal problems with its finding of abandonment. *See Green*, 241 P. at 308 (adhering to its earlier rejection of abandonment). Thus, we continue to consider such abandonment analysis.

In contrast to the limited probative value of the assessments paid by Freeport or its involvement in the Pumping Complaint, building a road and a canal is powerful evidence that one will no longer need water rights for the land covered by these improvements.[25] As the district court found, such acts are "incompatible with irrigation," and provide far greater proof of an intent to abandon than mere non-use.[26]

Freeport argues that the district court erred by relying on evidence of abandonment before 1997.[27] Yet, this point is irrelevant. Even if we accepted Freeport's claim that it could not have had any intent to abandon until 1997, this was still eleven years before Freeport filed its sever and transfer applications in 2008.[28] As *Phelps Dodge* explains, "[f]ailure to use a permitted instream flow right *during the statutory period* may result in a finding of abandonment or forfeiture as it would any other water right in Arizona." 118 P.3d at

---

[25] While one might argue that a canal is consistent with irrigation because it is necessary for such irrigation, Freeport does not present this contention. Further, there is no claim that crops are being grown in the canal, and thus, no water rights are needed to irrigate the land actually covered by the canal, which will carry water tied to other land.

[26] The irrigation districts and non-Freeport applicants observe that roads can be temporary, but Freeport provides no indication that the road or canal at issue here actually was temporary.

[27] Freeport contends that prior to this point, the Decree was administered in such a way that parties were given the full amount of water available to them, regardless of how many acres they were actually irrigating in a given year.

[28] Notably, Freeport does not argue that the district court erroneously relied on outdated evidence of a road and canal which have since been removed.

1115 (emphasis added). Because the statutory period for forfeiture is five years, *Phelps Dodge* strongly suggests that if one demonstrates an intent to abandon coupled with nonuse for more than five years, he has abandoned his water rights. *See id.* By waiting *at least* eleven years before filing a sever and transfer application, Freeport has more than doubled this period. Notably, Freeport does not claim that it has in fact been using the water rights in question since 1997.

Thus, because the creation of (and failure to remove) the road and canal demonstrates an intent to abandon, and because Freeport failed to use its water rights in the land covered by the canal for at least eleven years, we cannot conclude that the district court clearly erred in determining that Freeport had abandoned its water rights in 1.4 acres of land that were part of the sever parcel in Application 147. Instead, by limiting its finding of abandonment to 1.4 acres out of the 15.5 acre parcel, the district court appropriately tailored its holding.[29]

E

While Plaintiffs contend that the district court erred by rejecting their objections of abandonment of the water rights in land that has become riverbed, there are serious questions with respect to whether Application 151 and the accompanying objections presenting this issue have become moot. *See supra* Part II.C.

---

[29] Because we conclude that the road and canal indicate overwhelming evidence of intent to abandon, there is no need to evaluate the district court's holding that a clear and convincing evidence standard applies to questions of abandonment under Arizona law, and we express no opinion on such matter.

Although there are no mootness concerns associated with several other objections that allegedly involve land that has become riverbed,[30] the district court either made no particular findings of abandonment in regard to these applications or otherwise dismissed the issue.[31] We decline to address the question of abandonment of water rights in land that has become riverbed in these applications in the first instance.[32] *See Smith*, 194 F.3d at 1052.

IV

For the foregoing reasons, we **AFFIRM** the district court's denial of Freeport's remaining applications and its holding that Freeport abandoned 1.4 acres covered by a road and canal in the sever parcel at issue in Application 147. We **REVERSE** the district court's ruling that Arizona's law of statutory forfeiture does not apply to Freeport's water rights and its denial of Plaintiffs' objections on this basis. We

---

[30] Applications 147, 150, and 162.

[31] The district court made no findings whatsoever regarding the abandonment of riverbed in Applications 147 and 162. In regard to Application 150, although it did not specifically discuss the abandonment of riverbed, the district court observed that it "appear[ed]" that Freeport had "abandoned a portion of Sever Parcel 150" but found it "inconclusive how many acres Freeport ha[d] abandoned because a portion of Freeport's legal description for Sever Parcel 150 l[ay] outside the named Decree acres." Thus, it declined to make a judgment on abandonment. The parties do not address the question of whether the land in Sever Parcel 150 is outside the Decree acreage on appeal.

[32] We note, however, that where objections remain pending, and the district court rejected claims of abandonment, statutory forfeiture may nonetheless apply. We leave it to district court to evaluate the application of forfeiture to these lands.

**REMAND** the remaining objections filed by the United States, the San Carlos Apache Tribe of Arizona, and the Gila River Indian Community to the district court to assess issues of mootness and the application of our holding that Arizona's law of statutory forfeiture applies to water rights that vested before 1919.

We **DISMISS** the cross-appeal in No. 14-17048, brought by Gila Valley Irrigation District and Franklin Irrigation District,[33] and the cross-appeal in No. 14-17047, brought by Larry W. Barney, Viri Viva Lunt Revocable Trust, TRP Family Trust, Ronald Howard, Janice Howard, Myrna Curtis, Joe B. Tatum, Judy L. Tatum, Harrington Ranch And Farm, S&R Daley, LP, and Steve Daley, Ross and Fawn Bryce Family Trust, Householder Family Limited Partnership, and Kenneth Claridge. We **GRANT** their joint motion to treat their joint opening brief as an amicus brief. We **DENY**, however, their joint motion to file a second amicus brief. *See* 9th Cir. R. 29-1.

Each party shall bear its own costs.

**AFFIRMED** in part, **DISMISSED** in part, **REVERSED** in part, and **REMANDED**.

---

[33] While Gila Valley Irrigation District and Franklin Irrigation District cross-appealed from judgment on Freeport's subdocket, 4:31-cv-00061-SRB, in addition to appealing from the main docket, No. 4:31-cv-00059-SRB, the irrigation districts considered themselves to be amici on the subdocket, and the district court treated them accordingly. Thus, notwithstanding our consideration of appeals from the Freeport subdocket, it is appropriate to dismiss the cross-appeal of the irrigation districts from 4:31-cv-00061-SRB.